# United States Court of Appeals
## For the First Circuit

No. 04-2044

UNITED STATES,

Appellee,

v.

CHRISTOPHER JOSEPH LAWLOR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Howard, Circuit Judge,
Cyr, Senior Circuit Judge,
and Stahl, Senior Circuit Judge.

Brett D. Baber, with whom Law Office of Brett D. Baber, P.A., was on brief for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

April 27, 2005

**STAHL, <u>Senior Circuit Judge</u>.** On the morning of May 29, 2003, Maine State Police Trooper Thomas Fiske ("Fiske") went to the residence of Appellant Christopher Lawlor ("Lawlor") to investigate a report of a gunshot and an altercation between two men at the house, one of whom proved to be Lawlor. After arriving at the scene and subduing the two men, Fiske conducted a warrantless search of the residence and found a shotgun. Lawlor was then formally arrested and later charged with making an unregistered, short barreled shotgun, in violation of 26 U.S.C. §§ 5861(f), 5871, and possession of such a shotgun, in violation of 26 U.S.C. §§ 5861(d), 5871. Subsequently, Lawlor filed a motion to suppress the shotgun. Based on a stipulated record (the parties having agreed that an evidentiary hearing was not necessary), the magistrate judge assigned to the case recommended that the district court allow the motion. After the government objected to the recommendation, the district court decided to hold an evidentiary hearing. Following that hearing, the district court rejected the recommendation and denied the motion. Lawlor now seeks review of the district court's decision to (1) conduct an evidentiary hearing and (2) deny his motion to suppress. Finding no error, we affirm.

## I. Background

At approximately 7:00 a.m. on May 29, 2003, Andrew McLaughlin ("McLaughlin") called the Maine State Police and reported seeing an altercation between two men and hearing a

-2-

gunshot outside a specified residence in Enfield, Maine (the "Lawlor residence," the "residence," or the "house"). Soon thereafter, Fiske was ordered to travel to the Lawlor residence.

Fiske was familiar with the residence and its occupants. In 1998 or 1999, he had arrested Lawlor's father and brother at the residence. It was then that Fiske first encountered Lawlor. Significantly, Fiske believed that Lawlor was living in the residence on the date in question and that his brother also lived there "from time to time."[1] In addition, Fiske was aware that the Maine State Police had received intelligence connecting the residence and its occupants with illicit, drug-related activities. And, over the years, while fulfilling his "patrol duties," Fiske had regularly observed "individuals coming and going from th[e] house."

When Fiske arrived at the residence, he saw Lawlor and another man, later identified as Christopher Tomah ("Tomah"), standing in the driveway. Fiske also saw a woman, later identified as Ann Delaite ("Delaite"), standing in the doorway to the house. Lawlor and Tomah were yelling at each other, and Lawlor was holding a three-and-a-half foot long two-by-four over his shoulder and appeared ready to strike Tomah. Fiske drew his revolver, ordered

_____

[1]All quotations in the background section of this opinion are taken from Fiske's suppression hearing testimony.

-3-

both men to the ground, and after they had complied, handcuffed them. The men were visibly inebriated. Fiske did not see a gun.

At that point, a second trooper, Barry Meserve ("Meserve"), arrived at the scene. Fiske then noticed two spent shotgun shells on the ground in front of the doorway to the residence. Fiske asked Lawlor and Tomah for the location of the gun. At the suppression hearing, Fiske testified that he did so because he "was concerned that there may still [have been] an assailant with a gun" in or around the residence. Lawlor initially denied knowledge of any gun but, a short time later, asked Fiske to specify the gun to which he was referring, thus implying that there were several guns inside the house. After Fiske said that he wanted to know the location of the gun from which the abovementioned shells had been fired, Lawlor shrugged his shoulders.

Fiske then went inside the house, leaving Meserve with Lawlor and Tomah. Fiske did not have a warrant to search the house. Upon entering the house, he walked first through the kitchen, then the living room, and then two rooms off of the living room. In one of the latter two rooms, he found a shotgun on the floor in plain view. The shotgun smelled of gunpowder, an indication that it had been fired recently. After looking into one final room located adjacent to the room containing the shotgun, Fiske picked up the gun and went outside.

As Fiske made his way through the rooms, he also noticed a straw and a plate covered with white powder, which he believed to be cocaine. But, at the time, Fiske seized only the shotgun.

After the search, Lawlor was formally arrested. He later was charged in a two-count indictment. Count I alleged that he had made an unregistered, short-barreled shotgun, and Count II charged him with possession of the shotgun. On August 20, 2003, Lawlor moved to suppress the shotgun on the ground that it was the product of an unlawful, warrantless search. The district court referred the motion to a magistrate judge for a report and recommendation. Following the referral, the parties agreed that there was no need for the magistrate judge to conduct an evidentiary hearing before issuing her recommendation, and consequently, they submitted the motion on the papers.[2] On October 23, 2003, the magistrate judge recommended that the motion be granted. The government objected to the recommendation. Before ruling on the objections to the magistrate judge's recommendation, the district court, acting <u>sua sponte</u> and over Lawlor's objection, conducted an evidentiary hearing. After the hearing, the district court denied the suppression motion, finding that the search was justified under the protective sweep and emergency doctrines.

---

[2]The "papers" consisted of Fiske's incident report and the affidavit in support of his request for a search warrant. (After seizing the shotgun and arresting Lawlor, Fiske applied for a warrant to search the entire residence.)

On May 17, 2004, Lawlor pleaded guilty to Count II, reserving his right to appeal the suppression ruling. Count I was later dismissed on the government's motion.

On appeal, Lawlor challenges both the district court's decision to hold an evidentiary hearing on the motion to suppress and its ultimate denial of that motion. We address the challenges in turn.

## II. Discussion

A.      Evidentiary Hearing

Lawlor claims that the district court erred in conducting an evidentiary hearing on the motion to suppress because the parties had previously agreed that the motion was to be submitted to the magistrate judge on the papers. We disagree.

The relevant statute, 28 U.S.C. § 636(b)(1), provides that when a party objects to a magistrate judge's recommendation on a matter, the district court "shall make a de novo determination of . . . [the] recommendation[]." The district court "may accept, reject, or modify, in whole or in part, the . . . recommendation[] made by the magistrate judge." § 636(b)(1). And, in conducting its de novo review, the district court "may . . . receive further evidence [on] the matter." § 636(b)(1).

Thus, as a general rule, a district court is permitted to conduct an evidentiary hearing when reviewing a magistrate judge's recommendation on a motion. See United States v. Raddatz, 447 U.S.

-6-

667, 676 (1980); Stauble v. Warrob, Inc., 977 F.2d 690, 695-96 n.7 (1st Cir. 1992). The issue here, however, is whether the fact that the parties agreed that the magistrate judge could decide the motion to suppress on the papers precluded the district court from later conducting an evidentiary hearing. It did not. The district court had a statutory obligation to "make a de novo determination" of the magistrate judge's recommendation with respect to the motion and, in doing so, was expressly authorized to "receive further evidence [on] the matter." § 636(b)(1).

The two cases that Lawlor cites to support his position, United States v. McGill, 952 F.2d 16 (1st Cir. 1991), and United States v. Shapiro, 879 F.2d 468 (9th Cir. 1989), are easily distinguished from the case at hand, as each involved pretrial evidentiary stipulations entered into before a district court; neither involved a district court's review of a magistrate judge's recommendation in a situation where the parties had agreed to limit the evidence before the magistrate. Given that such review is de novo, the binding effect of an evidentiary agreement entered into before a magistrate judge is not comparable to that of one entered into before a district court.

B.        Motion to Suppress

Having determined that the district court did not err in conducting an evidentiary hearing on the motion to suppress, we now consider whether it erred in denying that motion. Our review of

-7-

the denial of the motion to suppress is bifurcated. United States v. Charles, 213 F.3d 10, 18 (1st Cir. 2000). We review de novo the district court's ultimate legal decision to deny the motion. Id. But, we review its factual findings only for clear error. Id.

Lawlor argues that the district court should have suppressed the shotgun because the warrantless search of his residence was unlawful. The government, however, insists that the district court correctly found that the search was justified pursuant to both the protective sweep and emergency doctrines. Because we believe that the search was a lawful protective sweep, we need not, and do not, consider the applicability of the emergency doctrine.[3]

For a search to be lawful, it must be reasonable. See U.S. Const. amend. IV. And, "[a] warrantless search of a private residence is presumptively unreasonable." United States v. Tibolt, 72 F.3d 965, 968 (1st Cir. 1995). There are, however, exceptions to this general rule.

One exception, announced by the Supreme Court in Maryland v. Buie, 494 U.S. 325 (1990), is that following an in-home arrest, police officers may conduct a protective sweep of the premises if "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent

_____

[3]For an account of the emergency doctrine, see United States v. Beaudoin, 362 F.3d 60, 66 (1st Cir. 2004).

officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334. Such a search is limited to "a cursory inspection of those spaces where a person may be found." Id. at 335.

Buie did not address whether a protective sweep can follow an arrest made just outside of the home (the situation we have here), and we have not previously spoken on the issue. Nevertheless, a number of our sister circuits allow protective sweeps in this situation. See, e.g., United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003); United States v. Wilson, 306 F.3d 231, 238 (5th Cir. 2002); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995); United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990). In announcing the protective sweep doctrine in Buie, the Supreme Court found significant the "risk of danger in the context of an arrest in the home" due primarily to the reality that there may be "unseen third parties in the house." 494 U.S. at 333, 336. We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the

-9-

scene.[4] See Colbert, 76 F.3d at 776-77 ("[T]he fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers ha[d] a reasonable articulable suspicion that a protective sweep [wa]s necessary by reason of a safety threat."); Henry, 48 F.3d at 1284 ("That the police arrested the defendant outside rather than inside his dwelling is relevant to the question of whether they could reasonably fear an attack by someone within it.").

Given the circumstances with which the officers in this case were confronted, we think that Fiske's entry into and cursory inspection of the residence was reasonable. A reasonably prudent officer in Fiske's position would have been warranted in fearing that the residence harbored an individual posing a danger to those at the scene.[5] Before Fiske arrived at the house, he was told that

_____

[4]We also note that the fact that a formal arrest takes place after a protective sweep is not determinative. This is because "whether a formal arrest occur[s] prior to or follow[s] 'quickly on the heels' of [a] challenged search does not affect the validity of the search so long as . . . probable cause [to arrest] existed prior to the search." United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)). Thus, here, it is immaterial that Lawlor was not formally arrested until after the sweep because there was probable cause to arrest prior to the sweep and the arrest occurred immediately after the sweep.

[5]The fact that the sweep revealed that there was no person inside the house has no bearing on whether Fiske was justified in conducting the sweep in the first place. See Buie, 494 U.S. at 335-36 ("The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger . . . ." (emphasis added)); Henry, 48 F.3d at 1284 ("While it is true that the officers could not be certain that a threat existed inside the apartment, this does not

-10-

there had been a report of a gunshot at the scene. Also, he believed that Lawlor and his brother lived in the house and that the house and its occupants were involved in illegal, drug-related activities. And, over the years, Fiske had routinely observed "individuals coming and going from th[e] house." Upon his arrival, Fiske found two drunken combatants--Lawlor and an unidentified man, an unidentified woman, and spent shotgun shells outside the house. Significantly, Fiske did not observe the gun from which the shells had been discharged, had no idea who had fired the gun, knew that the unidentified combatant was not Lawlor's brother, and was positioned (along with the combatants and Meserve) just outside the house on its driveway--an area vulnerable to attack from someone inside the house. What is more, when Fiske asked Lawlor for the location of the gun that had produced the shells, Lawlor shrugged his shoulders. Under these circumstances, Fiske was justified in entering the residence and conducting a protective sweep. Cf. United States v. Carter, 360 F.3d 1235, 1242 (10th Cir. 2004) (finding that a search conducted after an arrest outside the home was not a lawful protective sweep because "the officers had no reason to believe a third person . . . would attack them while they were outside").[6]

_____

impugn the reasonableness of their taking protective action.").

    [6]Lawlor's reliance on United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003), and United States v. Weidul, 227 F. Supp. 2d 161, 165-66 (D. Me. 2002), aff'd, 325 F.3d 50 (1st Cir. 2003), is

Moreover, there can be no objection to the scope of the sweep, as Fiske conducted a cursory inspection of only those spaces where a person could have been found. Fiske walked through a handful of rooms and then, almost immediately after finding the shotgun in plain view, went back outside.[7] The fact that, while conducting the sweep, Fiske noticed what he thought was cocaine but seized only the shotgun (the weapon that he most feared being attacked with) supports our view that this was a lawful protective sweep and not an illegitimate search for evidence.[8]

---

misplaced. In Weidul, "the only person known to have posed a danger to anyone's safety[] had been removed [from the residence] prior to the search." 227 F. Supp. 2d at 166. The same is true as to Paradis. See 351 F.3d at 29 ("There was no reason to think that there was another person . . . in the small apartment."). Here, by contrast, even after Lawlor and Tomah had been immobilized, Fiske had reason to believe that the residence still harbored at least one individual who posed a danger to those at the scene.

[7]Lawlor does not contest the finding that the gun was in plain view.

[8]Lawlor argues that the search was not a lawful protective sweep because: (1) Fiske conducted a warrantless search of the house before exploring other, less intrusive means of ensuring the safety of those at the arrest scene (e.g., instead of conducting the sweep, Fiske could have asked Lawlor, Tomah, or Delaite whether there was anyone else in the house); (2) neither Fiske nor Meserve behaved in a way that indicated that they feared an attack from within the house (e.g., Fiske opted to enter the house alone rather than to wait for backup); and (3) before leaving the house, Fiske did not check all of the areas where a person could have been hidden. However, Lawlor's arguments miss the mark. What is important is that Fiske was justified in entering the house to conduct a protective sweep and that the sweep itself was appropriate in scope. See Whren v. United States, 517 U.S. 806, 813 (1996) (holding that an officer's subjective belief or intention is irrelevant to Fourth Amendment analysis).

**Affirmed.**