*123 STAHL, Senior Circuit Judge,
concurring in part and dissenting in part.
The majority’s decision today misapplies precedent that dictates what is permissible under the modest “protective sweep” doctrine announced in Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The two officers who testified at the suppression hearing each stated that they had no reason to think that anyone dangerous (other than Charles Winston himself) was in the house where the safe was found. The government on appeal urges a number of factors it speculates might have given an officer grounds to fear an ambush here, including the fact that Winston was known to own and carry a firearm, but I do not believe that these factors add up to the degree of suspicion that Buie requires before a protective sweep may be conducted. The district court correctly concluded that the Fourth Amendment did not permit the agents who arrested Charles Winston to conduct a protective sweep of the basement of the apartment in which they found him, and that the evidence that resulted from that search had to be suppressed. While I join the majority in holding that the search of the nightstand was constitutional, I disagree with its conclusion that the search of the basement was likewise permissible. Respectfully, I dissent.
I.
Before discussing my disagreement with the majority’s position, I address the government’s anterior argument that the search was not a protective sweep at all, and that the agent who searched the basement was in fact simply searching for Charles Winston. The district court found that the search of the basement “cannot be justified by any attempt to locate the defendant” because “the agents had no need to search the basement for the defendant, having taken him into custody immediately upon entering the apartment.” I would uphold the district court’s factual conclusion.
At the hearing, the government relied on two witnesses, Special Agent Donald Wales, the arresting officer, and Special Agent Patrick Burns, another member of the arrest team. Notably, the state did not present the testimony of a Massachusetts State Trooper named Martin, the officer who performed the basement search and uncovered a concealed safe behind a furnace.
On the basis of the officers’ testimony presented at the hearing, faithfully recounted by the district court and by the majority, it might be possible to take a number of views of what happened in the basement on the day Winston was arrested. One could surmise that Martin tore into the building and down the basement steps and quickly uncovered the safe, all before Agent Wales mounted the stairs and apprehended Winston on the second floor landing. Or one might conclude that Martin headed straight for the basement and was still there, searching for Winston and oblivious of the fact that the agents upstairs had already located him, when he discovered the safe. And it also might be possible to conclude that the apartment was so small that Martin, down in the basement, heard the ruckus upstairs, knew that Winston had been located, but continued searching nevertheless.
The district court rejected the first possibility out of hand, finding that Winston’s arrest took place “within seconds” of the agents’ entrance into the apartment. That left two possibilities: either Martin never gleaned that Winston had been located upstairs, or he did but continued to search anyway. On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defen *124 dant, and it is the government’s burden to demonstrate the legitimacy of the search. See United States v. Lopez, 380 F.3d 538, 543 (1st Cir.2004) (citing Mincey v. Arizona, 437 U.S. 385, 390-91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). The government made its case harder, if indeed it had a case, by failing to provide the testimony of Trooper Martin himself. So long as Martin did not know that Winston had been found, he surely had a right to continue looking for him as long as his fellow officers made reasonably diligent efforts to communicate the fact of the arrest to him. But only Martin himself could have testified as to whether he had reason to believe that Winston had been found.
The court had to determine, without the benefit of Martin’s testimony, whether Martin knew or did not know that his license to continue searching for the defendant had come to an end. Under the right circumstances, it would probably be reasonable to infer that an agent did not know — but given the burden on the government, the uncertainty in this case had to be resolved in the defendant’s favor. What is more, the district judge took a view of the house itself, and that fact is to be given much weight in our analysis. On the basis of the small size of the apartment as observed during the view, the district judge evidently concluded that anyone searching the basement would have been in a position to hear what was happening on the stairs to the second floor of the unit. Without Martin’s testimony to the contrary, I defer to the district court in its finding that the officers “had no need to search the basement for the defendant, having taken him into custody immediately upon entering the apartment.”
II.
Once Martin’s authority to search for Winston himself expired, the only remaining justification for continuing his search would have been that he was searching for potential assailants hiding in wait in the basement. In my opinion, such a protective sweep was not permissible here.
When law-enforcement agents legally enter a home and arrest a criminal suspect, the suspect nevertheless retains “an expectation of privacy in those remaining areas of his house” which the police have not yet searched. Buie, 494 U.S. at 333, 110 S.Ct. 1093. The majority thinks that in this case, Winston’s interest in that privacy was outweighed by the searching officer’s purported interest in the arrest team’s safety. In so holding, it strikes a balance that is not in line with Buie or with the great mass of cases in any circuit in this area that have been decided in the years since Buie was handed down, and reaches a conclusion unsupported in the record.
Warrantless searches are “per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.” Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Buie established one such exception, which permits a protective sweep incident to an arrest if the searching officer has “a reasonable belief based on specific and articulable facts which, taken together with the rational inferences- from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others.” Buie, 494 U.S. at 325, 110 S.Ct. 1093 (internal quotations and citations omitted).[2] The constitutionality of a pro *125 tective sweep under particular circumstances is a mixed question of fact and law: we review the court’s factual findings for clear error “and then review de novo its ultimate conclusion that the discerned facts constitute a sufficient legal basis to justify the conduct about which the defendant complains.” United States v. Martins, 413 F.3d 139, 146 (1st Cir.2005) (citing United States v. Schaefer, 87 F.3d 562, 565 (1st Cir.1996); United States v. Tibolt, 72 F.3d 965, 969 (1st Cir.1995)).
The Buie Court went to some effort to ensure that law-enforcement agents (as well as courts) would understand that the decision permits only limited searches and only under particular, narrow circumstances: a Buie sweep is “not a full search of the premises” and can involve only a “cursory” inspection of spaces in which a person could be found, 494 U.S. at 335, 110 S.Ct. 1093; it is not a “top-to-bottom” search, id. at 336, 110 S.Ct. 1093; and it is “decidedly not ‘automatic],’ ” id. (alteration in original) (quoting Chimel v. California, 395 U.S. 752, 766-67, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). Respectful of these admonishments, we have strictly construed Buie’s exceptions to the prohibition on warrantless searches.
Every one of our own cases addressing the propriety of a protective sweep has turned on the searching officer’s suspicion vel non, based on some affirmative evidence, that a particular and identifiable individual, for example, the arrestee’s missing accomplice or housemate, remained in the building that was searched. See Martins, 413 F.3d 139 (man whose voice answered door thought to be inside apartment); United States v. Lawlor, 406 F.3d 37 (1st Cir.2005) (suspect’s brother thought to be in house); Crooker v. Metallo, 5 F.3d 583 (1st Cir.1993) (suspect’s accomplice thought to be in house); United States v. Daoust, 916 F.2d 757 (1st Cir.1990) (homeowner thought to be in house); see also United States v. Paradis, 351 F.3d 21, 29 n. 7 (1st Cir.2003) (protective sweep not permissible because police did not “believe that a specific individual other than the arrestee [was] present and dangerous”).
Our sister circuits are widely in agreement. See, e.g., United States v. Gandia, 424 F.3d 255, 264 (2d Cir.2005) (“Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties.” (citing United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir.2004))); see also United States v. Carter, 360 F.3d 1235, 1242-43 (10th Cir.2004); United States v. Chaves, 169 F.3d 687, 692 (11th Cir.1999); Sharrar v. Felsing, 128 F.3d 810, 825 (3d Cir.1997); United States v. Colbert, 76 F.3d 773, 777-78 (6th Cir.1996); United States v. Ford, 56 F.3d 265, 269 & n. 6 (D.C.Cir.1995); United States v. Delgadillo-Velásquez, 856 F.2d 1292, 1298-99 (9th Cir.1988) (anticipating Buie ).[3]
*126 By their own admission at the suppression hearing, the agents in this case had no information indicating affirmatively that anyone other than Winston was in the house. There was, as far as the government showed, only the defendant’s car in front of the building, and no one had entered the apartment for the hour and a half that the officers spent watching the house prior to their entry. The government’s only two witnesses were Wales and Burns. On cross-examination by the defense, Wales was asked: “You didn’t have any reason on that morning to believe that there was any other specific person that you knew of in that apartment, is that correct?” Wales testified in reply: “I didn’t have any reason to believe there was anybody in either one.”[4] Similarly, Agent Burns was asked, “You had no information whatsoever that Mr. Winston had anybody there who would attempt to aid him or anything like that in the event of an arrest, is that correct?” Burns replied simply, Wes.”
As far as the government showed at the hearing, therefore, the officers at the arrest site that day had no information that would indicate that anyone other than Winston was in the house in which they hoped to arrest him.[5] And if Buie’s admonition that its exception is not to be seen as automatic is to mean anything at all, “Hack of information cannot provide an articulable basis upon which to justify a protective sweep.” Colbert, 76 F.3d at 778. Cf. id. (protective sweep unjustified in part because the arresting officer “testified that he ‘didn’t have any information at all’ when asked whether he had information that anyone was inside the ... apartment prior to his decision to conduct the protective sweep”). See also Carter, 360 F.3d at 1242-43 (“Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in Buie.”)-, Delgadillo-Velásquez, 856 F.2d at 1298 (protective sweep was unconstitutional where officers had “no information that any other persons were in the apartment”).
The majority’s approval of the search here rests in large part on the arresting officers’ belief that Winston had, at some point, bought two guns and a bullet-proof vest from a co-conspirator, and the report of a police officer who had detained Winston for a traffic violation and found he was carrying a handgun. These facts should have given the arrest team cause to worry that Winston himself posed a threat to them, but they did nothing to justify a belief that there was anyone else in the house with Winston on the day of his arrest. “The facts upon which officers may justify a Buie protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual.” Colbert, 76 F.3d at 777 (emphasis added).
*127 The majority also relies on Winston’s yell (suspiciously quick) from the top of the stairs, indicating to the agents that he was on the second floor, along with Winston’s girlfriend’s attempt (suspiciously dilatory) to mislead the agents by denying knowledge of the car parked out front. The latter, the majority thinks, might have been an effort to delay the police while an ambush was set up, while the former could have been an effort to distract them while it was being sprung. Though not an argument offered by either of the officers in their testimony, this seems a plausible theory. In order to justify a Buie sweep, however, law-enforcement agents need more than a plausible theory that hypothesizes a third person on the premises. Nearly any indication that some third person is present might be enough — an unaccounted-for voice behind a door, Martins, 413 F.3d at 151; movement in an upstairs window, Burrows, 48 F.3d at 1017; an extra car in a driveway, United States v. Hauk, 412 F.3d 1179, 1192 (10th Cir.2005) — but without any affirmative indication of this sort that a third person may be lying in wait, the police have nothing more than the “mere ‘inchoate and unparticularized suspicion or “hunch” ’ ” that the Court indicated in both Terry and Buie was insufficient to justify a warrantless search. Buie, 494 U.S. at 332, 110 S.Ct. 1093 (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).[6]
III.
For the foregoing reasons, I would affirm the decision of the district court to suppress the material seized from the safe in Winston’s basement and Winston’s statement made in response to the discovery of that safe. I respectfully dissent.

. There are two Buie exceptions to the warrant requirement, of which the one claimed to apply in this case is the second, broader type discussed in the text. Under the first exception, officers are permitted to, "as a precautionary matter and without probable cause or *125 reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.” Buie, 494 U.S. at 334, 110 S.Ct. 1093. The government is rightly not claiming that the basement search here was of a "space immediately adjoining the place of arrest.”

. The Fourth Circuit has produced no cases in point. The Fifth Circuit has few, but they are consistent with the general principle I have described. See United States v. Waldrop, 404 F.3d 365, 369 (5th Cir.2005); United States v. Muñoz, 150 F.3d 401, 411-12 (5th Cir.1998). The Seventh Circuit is similarly consistent. See, e.g., Leaf v. Shelnutt, 400 F.3d 1070, 1088 (7th Cir.2005); United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir.1995); United States v. Barker, 27 F.3d 1287, 1291 (7th Cir.1994). A more permissive view is taken in the Eighth Circuit. See United States v. Cash, 378 F.3d 745, 749 (8th Cir. *126 2004); United States v. Horne, 4 F.3d 579, 586 (8th Cir.1993).

. Wales had earlier testified that the agents had set out to look for Winston at 110-A Carr Street, but on arriving at the location had discovered that the building at 110 Carr Street had two unmarked doors. Wales’ reference to "either one" was a reference to the confusion: Wales evidently did not have information about whether anyone was in either of the two apartments that might have been 110-A.

. Once Winston’s girlfriend Ortiz opened the door, the agents of course knew that she was there, but Ortiz’s presence did not make the presence of dangerous third parties more likely-

. The government makes a pair of additional arguments in favor of admission of the evidence at issue, but both are unavailing. The first is easily disposed of: the government argues on appeal that the safe in the basement would inevitably have been found and thus should be admissible under the inevitable discovery rule of Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), but it did not make that argument to the district court and it offers no reason why we should take it up for the first time on appeal. See United States v. Dimeo, 28 F.3d 240, 241 n. 3 (1st Cir.1994); United States v. Elwell, 984 F.2d 1289, 1298 (1st Cir.1993). For the second, the government raises the question of the applicability of the good-faith exception to the warrant requirement, announced in United States v. Leon, 468 U.S. 897, 924, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which permits an officer to rely on a defective warrant if he does so in good faith. The good faith exception is inapposite here, however. The doctrine forgives an officer for the error of a magistrate or other official who issues a warrant, but is not available to an officer who objectively should have known that the information supporting the application was unconstitutionally obtained. “Leon requires not merely good faith, but objective good faith.” United States v. Curzi, 867 F.2d 36, 44 (1st Cir.1989) (citing Leon, 468 U.S. at 924, 104 S.Ct. 3405). I need not question the subjective good faith of the agents who searched Winston's house in order to conclude, as I do, that it would not have been reasonable for them to believe that their searches were constitutionally permissible.