HUMPHREYS, J., with whom BENTON and ELDER, JJ., join, dissenting.
Because I disagree with the majority’s assertion that the officers’ entry into the home constituted a valid protective sweep, I respectfully dissent. Under the circumstances of this case, the Commonwealth failed to articulate any facts that would have justified an objectively reasonable belief that an individual inside the home posed a danger to the arresting officers. Thus, I would hold that the trial court should have granted Williams’ motion to suppress, and I would reverse his conviction for possession of a firearm by a convicted felon.
Initially, I note that the trial court, when denying the motion to suppress, relied upon two separate legal theories, only one of which is discussed by the majority. First, the trial court found that the warrantless entry was permissible because the officers were “entitled to do a protective sweep to make sure there’s no one else in the apartment who has access *458 to this weapon that Mr. Williams has told them is there.” Second, the trial court held that the community caretaker doctrine validated the warrantless entry, reasoning that the weapon was “left out in an open situation where the child could get to it if they came back into the house.” In my opinion, neither doctrine validates the warrantless search at issue in this case.
I.
Warrantless searches are presumptively unreasonable. See, e.g., Megel v. Commonwealth, 262 Va. 531, 534, 551 S.E.2d 638, 640 (2001). This is quintessentially so when police search a person’s home. “It is axiomatic that the ‘physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.’ ” Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). Thus, “the Fourth Amendment has drawn a firm line at the entrance to the house,” Steagald v. United States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981), and, “[a]bsent exigent circumstances, the threshold [of a dwelling] may not reasonably be crossed without a warrant,” Hill v. Commonwealth, 18 Va.App. 1, 3, 441 S.E.2d 50, 52 (1994). As noted by the majority, however, the Supreme Court has delineated various exceptions to this rule, one of which is the “protective sweep” doctrine.
In Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court defined a “protective sweep” as “a quick and limited search of the premises, incident to an arrest[, which is] ... conducted to protect the safety of police officers or others[, and] ... is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.” Id. at 327, 110 S.Ct. at 1094. In Buie, however, the Court distinguished between two “tiers” of protective sweeps. First, an arresting officer, “as a precautionary matter and without probable cause or reasonable suspicion,” may “look in closets and other spaces immediately *459 adjoining the place of arrest from which an attack could be immediately launched.” Id. at 334, 110 S.Ct. at 1098. “Beyond that, however, ... there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.” Id.
Under the circumstances of this case, Williams was arrested outside of the apartment building. Because the area to be swept was not “immediately adjoining the place of arrest,” the “first tier” standard for protective sweeps is clearly inapplicable. See Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir.1997) (“[A] sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis.”); State v. Spencer, 268 Conn. 575, 848 A.2d 1183, 1193 (“In the present case, the defendant was arrested in a first floor common hallway at the bottom of a stairway of approximately twelve to fourteen steps leading up to his second floor apartment. Therefore, the defendant’s apartment cannot be characterized as a space ‘immediately adjoining’ the place of arrest.”), cert. denied, 543 U.S. 957, 125 S.Ct. 409, 160 L.Ed.2d 320 (2004); cf. Servis v. Commonwealth, 6 Va.App. 507, 519, 371 S.E.2d 156, 162 (1988) (“If the suspect moves about, an officer is justified in staying with the individual during the course of the stop and conducting a protective search of the areas which come within the suspect’s immediate control, even if this action necessitates entry into the suspect’s home.” (emphasis added)).[6]
*460 Rather, this case must be analyzed under the standard articulated for the “second tier” of protective sweeps—specifically, the Commonwealth must have presented “articulable facts” that would have warranted an objectively reasonable belief that the apartment continued to “harbor an individual posing a danger to those on the arrest scene.” Buie, 494 U.S. at 334, 110 S.Ct. at 1098; see also United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) (noting that the government bears the burden of establishing facts sufficient to support application of an exception to the warrant requirement); Megel, 262 Va. at 534, 551 S.E.2d at 640 (“[T]he Commonwealth has the heavy burden of establishing an exception to the warrant requirement.”). Notably, because Williams was already in police custody, “the focus of our inquiry is ‘whether the arresting officers reasonably believed that someone else inside the [home] might pose a danger to them.’ ” Spencer, 848 A.2d at 1194 (quoting United States v. Colbert, 76 F.3d 773, 777 (6th Cir.1996)) (emphasis and alteration in original).
Although the majority recognizes this general rule, it fails to apply it to the facts of this particular case.[7] Specifically, the *461 record is devoid of any “articulable facts” that would support a reasonable suspicion that “an individual posing a danger” to the arresting officers was inside the “area to be swept.” Buie, 494 U.S. at 334, 110 S.Ct. at 1098. Thus, in my view, the officers’ entry cannot be validated as a “second tier” protective sweep. See id.
In Walls v. Commonwealth, 2 Va.App. 639, 347 S.E.2d 175 (1986), for example, this Court invalidated a post-arrest warrantless entry into the defendant’s home, reasoning that the entry was unconstitutional because the officer “pointed to no specific facts from which he could reasonably have concluded that either he or anyone else was in danger.” Id. at 648, 347 S.E.2d at 180. Although recognizing that “there is an exception to the warrant requirement allowing police officers to enter a building in response to a dangerous situation or an emergency,” we reasoned that the protective sweep doctrine did not apply because “there was no evidence[] that there were dangerous persons in the [residence].” Id. at 649, 347 S.E.2d at 181.
Similarly, here, the officers “pointed to no specific facts” that would have led the officers to believe “there were dangerous persons in the [residence].” Id. The Commonwealth presented no evidence that the apartment, a private residence in which a small child had been sleeping, might be harboring additional dangerous individuals. See Spencer, 848 A.2d at 1196 (invalidating protective sweep where “the officers’ testimony revealfed] that they had no information that any person *462 who posed a threat to the officers or to others might have been in the apartment at that time”); cf. United States v. Henry, 48 F.3d 1282, 1284 (D.C.Cir.1995) (upholding post-arrest protective sweep into defendant’s home where an informant “had advised officers ... that [the defendant’s] ‘boys’ or ‘counterparts’ might be with him”). After making their presence known, the officers secured the premises and did not observe anyone other than Bowman and her child entering or exiting the apartment. Cf. United States v. Steele, 788 F.Supp. 278, 282 (N.D.W.Va.1992) (holding that the officers presented sufficient articulable facts to justify a “reasonable inference that a danger may have existed in the interior of the apartment” where, inter alia, “there had been a brief period during which a person could have arrived at the apartment unobserved by the officers”).
Moreover, during the course of his extended conversations with law enforcement officials, Williams never implied, nor is there any other evidence to suggest, that anyone else was inside the apartment. Cf. Crosby v. Commonwealth, 6 Va.App. 193, 202, 367 S.E.2d 730, 736 (1988) (upholding warrantless entry based, in part, on the defendant’s “evasiveness when [police] asked him if anyone was at the apartment”). The officers did not see anyone else inside the apartment, nor, after Williams emerged, did they observe any signs—such as voices or sounds—that anyone remained in the apartment. See, e.g., People v. Celis, 33 Cal.4th 667, 16 Cal.Rptr.3d 85, 93 P.3d 1027, 1035 (2004) (holding that a post-arrest protective sweep of the defendant’s home was not justified where the officers “had no knowledge of the presence of anyone in defendant’s house,” reasoning that “[t]he facts known to the officers before they performed the protective sweep fell short of what Buie requires”). And, indeed, the record is clear that neither officer believed that anyone other than Williams remained inside the apartment after he emerged from the residence.[8]
*463 Accordingly, the Commonwealth failed to carry its “heavy burden” of presenting any “articulable facts” that would have justified an objectively reasonable belief that another individual was inside the residence, much less that there was an individual inside the apartment who posed a danger to the fifteen or twenty law enforcement officers surrounding the apartment. Although, as the officers testified, the police did not know “for sure there was no one else in the apartment,” it is clear that “[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep.” Colbert, 76 F.3d at 778 (holding that a protective sweep was unconstitutional where the officer “didn’t have any information at all” as to whether “anyone was inside the [defendant’s] apartment”); see also United States v. Delgadillo-Velasquez, 856 *464 F.2d 1292, 1298 (9th Cir.1988) (holding that a protective sweep was unconstitutional where officers had “no information that any other persons were in the apartment”). As the Sixth Circuit has explained,
allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep____ [Ajllowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court’s explicit command in Buie that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home. “No information” cannot be an articulable basis for a sweep that requires information to justify it in the first place.
Colbert, 76 F.3d at 778; see also State v. Hopkins, 113 Wash.App. 954, 55 P.3d 691, 695 (2002) (“[A] ‘general desire to be sure that no one is hiding in the place searched is not sufficient’ to justify a protective sweep outside the immediate area where an arrest has occurred.” (quoting State v. Schaffer, 133 Idaho 126, 982 P.2d 961, 966 (Ct.App.1999))).
Thus, to prevail on this theory, the Commonwealth must present “articulable facts” from which a reasonable police officer could infer that at the time of the “sweep,” the apartment was harboring an individual who posed a danger to “those on the arrest scene,” Buie, 494 U.S. at 334, 110 S.Ct. at 1098. In my view, the Commonwealth failed to do so.
The majority notes that, “in oral argument en banc appellant conceded that the testimony of Sergeant Barnett was ambiguous.” While his counsel answered in the affirmative in response to the question “wasn’t the testimony [of Sergeant Barnett] ambiguous,” I do not view counsel’s response as the equivalent of a factual concession that at the time of the entry, the evidence could be reasonably interpreted as indicating the apartment was occupied by anyone else. Nonetheless, based upon this “concession,” the majority asserts that because of its *465 ambiguity, the testimony “was subject to two factual interpretations” and that one interpretation, “and one specifically accepted by the trial court, was that the officer articulated a reasonable belief that an individual, with access to a weapon, may have remained in the apartment following appellant’s arrest.” (Emphasis added.) I respectfully disagree with the majority that Sergeant Barnett’s testimony, in the context of the information relayed from Ms. Bowman, admits to more than one reasonable interpretation. While the statement attributed to neighbors may have been ambiguous in the abstract, it is not at all ambiguous when placed on a time line and in context with the totality of the information available to the police at the time they conducted the sweep. The Commonwealth had the burden to establish a reasonable suspicion of occupancy at the time the protective sweep was conducted. This is the crucial distinction ignored by the majority. That is, the totality of the circumstances must be such that it was reasonable for the officers to conclude that someone other than Williams was in the apartment at the time they conducted the sweep. As the events unfolded, it is clear that although three people initially occupied the apartment, two departed prior to the “standoff’ between Williams and police and, as noted, the record does not indicate that Ms. Bowman, who was in the best position to know, did not indicate that anyone other than Williams remained in the apartment following her departure.
Once Bowman departed, a lengthy period of negotiations between the police and Williams followed. The record reflects no evidence whatsoever that during the negotiations, Williams provided information or the police observed anything that would give rise to a suspicion that anyone other than Williams was in the apartment once Ms. Bowman and her child left.
It was the Commonwealth’s burden to establish the necessity for the protective sweep at the time it was conducted, and in my view, the “ambiguous” testimony of Sergeant Barnett upon which the majority relies, is insufficient as a matter of law to do so. By the time Williams surrendered, it is clear that from the totality of the circumstances, and indeed as *466 conceded by Sergeant Barnett in his testimony, that at the time the officers entered the home, they believed no one else was in the house. In fact, Barnett testified that the “figure in the window” disappeared with Williams’ exit from the apartment. Moreover, the officers knew that the only other known occupants—Williams’ girlfriend and her child—had left the building hours earlier.
The police in this case could easily have recovered Williams’ weapon without transgressing the Fourth Amendment by securing the consent of Ms. Bowman who was apparently in the area and readily accessible or the Commonwealth could have elected to rely upon the permission she had already given. However, they simply decided not to do so. Accordingly, I would hold that the officers could not, consistent with the Fourth Amendment, cross the threshold of the apartment in order to conduct a protective sweep. See Walls, 2 Va.App. at 649, 347 S.E.2d at 181.
II.
Because I would find that the trial court erred in its application of the protective sweep exception to the warrant requirement, I must address the remaining legal theory articulated by the trial court in support of its ruling. However, for the reasons that follow, I likewise conclude that the trial court’s reliance on its second articulated basis for denying the motion to suppress, the community caretaker doctrine, was error.
The “community caretaker doctrine” authorizes, under certain circumstances, a warrantless search of a residence if that search is “totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.” Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973); see also Kyer v. Commonwealth, 45 Va.App. 473, 612 S.E.2d 213 (2005) (en banc). The appropriateness of applying the community caretaker doctrine is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that *467 his or her actions were necessary for, inter alia, protection of the public and the police from physical danger. Williams v. Commonwealth, 42 Va.App. 723, 730, 594 S.E.2d 305, 309 (2004). Overall, “[objective reasonableness remains the linchpin of determining the validity of [the] action.” Commonwealth v. Waters, 20 Va.App. 285, 290, 456 S.E.2d 527, 530 (1995).
"When a law enforcement officer conducts a warrantless entry in an attempt to protect against “physical danger,” however, this Court has held that the entry does not fall within the scope of the community caretaker doctrine unless the officer possessed a reasonable belief that “someone’s health or safety is genuinely threatened.” Kyer, 45 Va.App. at 480, 612 S.E.2d at 217. Here, the trial court found that the community caretaker doctrine validated the warrantless entry because the gun was “left out in an open situation where the child could get to it if they came back into the house or when they came back into the house.” It is undisputed, however, that the child was not, in fact, inside the apartment at the time of Williams’ arrest. Nor, according to their trial testimony, did the officers believe that any other individual remained inside the apartment. And Williams, the only identifiable person who might have posed a threat, was outside, handcuffed, lying on the ground, and surrounded by fifteen to twenty police officers. Because Williams “was in custody, he no longer posed a threat to the [public or the] police.” Henry, 48 F.3d at 1284.
Thus, the officers could not have reasonably believed that anyone—including the child—faced a risk of immediate harm or injury. Indeed, had the mother and child returned to the apartment, the officers could have ensured their continued safety merely by “freezing the scene” and preventing them from entering the apartment until a search warrant had been obtained and executed. Accordingly, I would also hold that the trial court erred in its alternate conclusion that the community caretaker doctrine validated the warrantless entry. See, e.g., United States v. McGough, 412 F.3d 1232, 1239 (11th Cir.2005) (holding that the community caretaker doctrine was *468 inapplicable where the police “had the situation under control” because the defendant “was under arrest and in custody in the police cruiser,” and there were no “exigent circumstances, such as the sounds of gunshots, fighting [or] the potential danger to human life ... that would have justified the officers’ decision to enter [the defendant’s] home”); cf. Lowe v. Commonwealth, 218 Va. 670, 677, 239 S.E.2d 112, 117 (1977) (holding that a warrantless entry was justified by exigent circumstances where “the officer had just ascertained the whereabouts of [an] armed robber,” and the robber “was in close proximity to two deadly weapons in plain view,” reasoning that “[t]he delay, however slight, incident to obtaining a warrant would ... increasefe] the danger of further violence to the police themselves and to the community at large”).
III.
Unquestionably, “the work of a police officer in the field is often fraught with danger.” Celis, 93 P.3d at 1036. However, “[society's interest in protecting police officers must ... be balanced against the constitutionally protected interest of citizens to be free of unreasonable searches and seizures.” Id. “In considering both interests, the United States Supreme Court has articulated certain legal rules,” id., and this Court is not at liberty to ignore those established constitutional standards. For this reason, I would hold that the warrantless entry in this case does not fall within the scope of the community caretaker exception, nor was it a permissible “protective sweep.”
Because the warrantless entry and search violated Williams’ Fourth Amendment rights, I would hold that the trial court erred in denying Williams’ motion to suppress. And, because I would reverse and remand this case for a new trial if the Commonwealth be so advised, I would not reach the issue of whether the evidence was sufficient to support Williams’ conviction. Thus, I respectfully dissent.

. I agree, however, that the fact that an arrest occurred outside a home does not, in and of itself, preclude the officers from conducting a protective sweep inside the residence. See, e.g., United States v. Lawlor, 406 F.3d 37, 41 (1st Cir.2005) ("We think that an arrest that occurs just outside the home can pose an equally serious threat to arresting officers as one that occurs in the home. Therefore, we accept the position that a protective sweep may be conducted following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene.”). However, because, under those circumstances, the officers would not have yet *460 crossed the threshold of the residence, the Commonwealth must provide a strong showing of articulable facts sufficient to justify the belief that there was an individual inside the house and that, absent immediate intervention, that individual poses a danger to the arresting officers. I further note that the risk of harm to the arresting officers cannot be created merely by the fact that the officers entered the residence, for, in that situation, the officers would have created the risk of harm themselves, something they are not constitutionally permitted to do. See, e.g., United States v. Webster, 750 F.2d 307, 328 (5th Cir.1984) (holding that, where law enforcement officers "create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby”).

. The majority apparently relies on a hybridization of the exigent circumstances exception and the protective sweep doctrine. Although I recognize the similarities between the two theories, they are, in fact, separate and distinct constitutional doctrines requiring the application of different legal standards. Specifically, officers may enter a home under the exigent circumstances exception if they have probable cause to believe that an individual inside the home poses a present danger to the public at large. See Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. *461 1684, 1690, 109 L.Ed.2d 85 (1990). A protective sweep, however, “can be justified by a standard lower than probable cause, namely, reasonable suspicion.” People v. Celis, 33 Cal.4th 667, 16 Cal.Rptr.3d 85, 93 P.3d 1027, 1036 (2004); see Buie, 494 U.S. at 334, 110 S.Ct. at 1098 (analogizing a protective sweep to a brief pat down under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or a search conducted during a traffic stop under Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), both of which are founded upon a reasonable suspicion that the search is necessary to protect officer safety). However, because the "lower standard” for performing a protective sweep under Buie "was not satisfied here, it follows that the higher standard requiring probable cause was not met either." Celis, 93 P.3d at 1036.

. The majority states that the officers had information from "neighbors” that individuals other than Williams might be inside the apart *463 ment. I believe, however, that this assertion inaccurately characterizes the testimony of the police officer. The entire evidence on this point— elicited during cross-examination—reads as follows:
[Defense Counsel]: And after Ms. Bowman and her daughter left, there was no indication anybody else was in the apartment?
[Officer]: From some of the neighbors, yes, there was. We had several people come up—
[Defense Counsel]: From your observations.
[Officer]: Not immediately, no, sir. Not until after some conversation with an individual on the phone did I see somebody inside the apartment.
[Defense Counsel]: Which was him?
[Officer]: Yes.
[Defense Counsel]: Mr. Williams?
[Officer]: Yes.
[Defense Counsel]: That’s the only person you saw?
[Officer]: Yes, but at the time I didn’t know it was him.
(Emphasis added). Moreover, and as the majority notes, shortly after Ms. Bowman left the residence, her sister approached police to convey information from Bowman. Specifically, the officer testified that she stated, "Mr. Williams was inside the apartment and he had a gun and that we had [Bowman’s] permission to go inside.” Significantly, Ms. Bowman’s information conveyed via her sister in no way suggests that anyone other than Williams remained in the residence. Taken in context, then, the officer’s testimony clearly establishes that, "after Ms. Bowman and her daughter left," the officer believed there was only one other individual inside the apartment, specifically, Williams. This is the only reasonable inference supported by the evidence. This testimony, even when viewed in the light most favorable to the Commonwealth, does not establish that the officer believed individuals other than Williams remained in the apartment after he emerged.