Lu, John T., J.
INTRODUCTION
The defendant, Christian Cortes (Cortes), moves to suppress a sweatshirt found in an apartment, along with bullets and a firearm found in a pocket of the sweatshirt, claiming that the seizure of the sweatshirt was based on an unlawful entry into the apartment and the unlawful arrest of Cortes.
Finding that police had probable cause to arrest Cortes for assault and battery before their entry into the apartment, that their entry was lawful because they had consent to enter the apartment, that the search of the apartment and the rear common staircase was a lawful protective sweep, and that the search of the sweatshirt was a proper search incident to a lawful arrest, the court denies the motion to suppress the fruits of the warrantless search.
FINDINGS OF FACT
Based on the evidence presented and reasonable inferences from the evidence, the court finds the following facts.
1. On March 19, 2007, Worcester police, including Officer Ronald Remillard (Remillard) received a radio call to respond to 17 Etna Street due to a report of a fight and a stabbing.
2. Remillard went to that address and saw Louis Rivera (Rivera) in a common hallway next to his apartment on the second floor.
3. Rivera was bleeding from a puncture wound to his chest but would not provide any information about who stabbed him.
4. Remillard and Detective Mike Mulvey (Mulvey) spoke with Rivera’s mother, Elizabeth or Lisbeth Rivera, who told them what had happened.
5. She said that Rivera was inside the apartment with her and there was a knock at the door.
6. Rivera answered the door and went into the hallway with the person at the door.
7. She heard a fight, went into the hall and saw several Hispanic men on top of Rivera, punching him.
8. She tried to help Rivera but one of the men punched her in the face with a closed fist.
9. She recognized the two men because they had attacked Rivera before and the Worcester police had been involved in the investigation of the attack.
10. Mulvey had investigated the earlier fight, which took place in about 2004, and he constructed a photo array for her to view.
11. She picked out photos of Cortes, Kenneth Cortes and Joseph Velez (Velez).
12. Police searched their master card record keeping system, located an address, 1 Vernon Terrace, for Cortes and determined that Cortes was a registered sex offender.
13. Two witnesses, Mejia and Pham, said that immediately after the attack, two Hispanic males wearing black sweatshirts got in a tan four-door Nissan Maxima and spoke in Spanish to the driver.
14. Pham and Mejia gave police the license plate number: 37WI79.
15. The men were in a hurry and tried to get in the car while it was moving.
16. One of the men said, “Did you get him?” Another responded, “Yeah, yeah. Let’s go.”
17. The Maxima went down one street and reversed direction to avoid police cruisers responding to the stabbing.
18. Police, including Remillard, went to 1 Vernon Terrace, where they saw a tan four-door Nissan Max-ima with a license plate that differed by one digit from the plate number given by Mejia and Pham.
19. 1 Vernon Terrace is less than half a mile from 17 Etna Street.
20. It was snowing but there was no snow on the car and the hood was warm to the touch.
21. Police followed footprints in the freshly fallen snow to the front door of 1 Vernon Terrace.
22. 1 Vernon Terrace is a triple-decker with common areas at the front and back of the apartments.
23. While standing in the driveway, police saw, through an open window of the first-floor apartment, four Hispanic men shouting and arguing in Spanish.
24. Some of the men wore black hooded sweatshirts and one wore a gray hooded sweatshirt.
25. They generally fit the description that police had received.
*173 26. One of the officers’ radios was set to a high volume and a loud transmission alarmed the men, who looked down at police.
27. The men closed the windows and blinds and shut off all the lights.
28. Police radioed for help but there was a delay of five to ten minutes in the arrival of help because of a shift change and snowy road conditions.
29. After other officers arrived, Remillard, along with two other uniformed officers, went to the first-floor apartment front door and Remillard knocked.
30. Due to safety concerns, including concerns arising from knowledge that the men may have participated in a stabbing, the earlier attack and the possible involvement of a sex offender, Officer Daniel Dowd (Dowd) and other officers went up the back steps.
31. Janie Home (Horne), a resident, opened the first-floor, front apartment door and Remillard asked to come in, explaining that they were investigating an assault and had seen the argument in the house.
32. She opened the door further and let police in.
33. The three police officers entered the apartment and conducted a search for the suspects.
34. Police found Orlando Vega and Velez in the apartment.
35. Police recognized the men as two of the four they had seen arguing minutes earlier.
36. The officers that went up the back steps eventually reached the third floor.
37. Dowd shined his flashlight around the third-floor common area.
38. He saw Kenneth Cortes, the defendant’s brother, attempting to hide behind an old washing machine or dryer.
39. Dowd told him to come out and to keep his hands where he could see them.
40. Kenneth Cortes looked like he had been in a fight; he had scratches on his face and neck and his hair was matted.
41. Other police officers, including Sean O’Connor (O’Connor), were with Dowd.
42. One of the officers aimed his flashlight into a partially open closet door and saw Cortes.
43. Police told Cortes to come out.
44. Police escorted Cortes and his brother down to the first-floor apartment.
45. Police believed that the Cortes brothers were the third and fourth men that they had seen arguing.
46. One of the officers told Remillard where they had found Cortes and his brother.
47. Remillard and another officer went up to the third-floor common area and looked around that area.
48. Remillard saw a blood-spattered T-shirt where Kenneth Cortes had been hiding.
49. Remillard left the bloody T-shirt, without touching it, for collection by crime scene technicians and returned to the first floor.
50. Sometime between the discovery of the Cortes brothers hiding on the third floor and their arrest, police asked them their names and they gave their true names.[2]
51. Police immediately understood that the Cortes brothers and Velez were the men that Elizabeth Rivera had identified.
52. Police arrested Cortes and his brother.
53. As Cortes, who was wearing just a T-shirt on his upper body, stood in the threshold of one of the bedrooms, he said he was cold and asked for his sweatshirt.
54. Officer Kevin Smith (Smith) asked which one and Cortes pointed at it.
55. Smith retrieved it and felt suspicious items, a gun and bullets.
56. Smith took the items out and found a plastic bag containing a pistol and bullets.
57. Police gave Cortes a sweatshirt to wear.
DISCUSSION
1. Probable Cause to Arrest
Probable cause to arrest exists where the facts and circumstances presented would warrant a person of reasonable caution in believing that the defendant has committed a crime or was committing an offense. Commonwealth v. Club Caravan, Inc., 30 Mass.App.Ct. 561, 566-67 (1991). The standard for probable cause to arrest has been defined as “more than mere suspicion but something less than evidence sufficient to warrant a conviction.” Commonwealth v. Roman, 414 Mass. 642, 643 (1999), quoting Commonwealth v. Hason, 387 Mass. 169, 174 (1982). In determining whether police have probable cause to arrest, the court must evaluate the information known to the police as a whole, and may draw permissible inferences from that information. Commonwealth v. Grammo, 8 Mass.App.Ct. 447, 450 (1979).
Police responded to a report of a stabbing at 17 Etna Street. Elizabeth Rivera told police that there had been a similar prior incident in which the police had been involved. She identified Cortes and others as the people who beat her son. The police looked up Cortes in their database and found the defendant’s address, 1 Vernon Terrace. Witnesses saw two Hispanic males wearing black sweatshirts get into a tan four-door Nissan Maxima with license plate number 37WI79. The men spoke in Spanish to the driver. The driver of the Maxima avoided police cruisers as he left 17 Etna Street. Police went to 1 Vernon Terrace and saw a tan four-door Nissan Maxima with a license plate that differed by one digit from that described by the *174 witnesses. The hood was warm and there was no snow on the car. Footprints in the snow led from the car to the front door of 1 Vernon Terrace. While standing outside the house, police saw, through an open window, four Hispanic men shouting and arguing in Spanish. They generally fit the description of the attackers. When the men realized that the officers were outside the apartment, they closed the blinds and turned off all the lights in an attempt to avoid detection. At this point, police had probable cause to arrest Cortes for assault and batteiy.
Cortes argues that because he was the legal occupant of 1 Vernon Terrace, he could not be lawfully arrested for trespassing. However, that assault and batteiy was not the stated grounds for the arrest is not dispositive. See Commonwealth v. Peters, 48 Mass.App.Ct. 15, 21-22 (1999) (finding valid a search incident to a lawful arrest for a drug offense, a search which had originally been advanced by the Commonwealth as a search incident to an arrest for a motor vehicle offense). Probable cause to arrest the defendant for assault and batteiy existed independent of probable cause to arrest for trespass. That police stated a different ground at the time of the arrest does not vitiate the basis for the arrest. Commonwealth v. Lawton, 348 Mass. 129, 133 (1964) (“If the facts known to the officer reasonably permitted a conclusion that probable cause existed for a charge of [assault and battery], the arrest should be treated as legal even though [the officer] at first assigned another ground” (alteration added)).
2. Entiy into the Vernon Terrace Apartment
The Fourth Amendment to the United States Constitution and Art. 14 of the Declaration of Rights of the Massachusetts Constitution prohibit warrantless arrests in the home, absent exigent circumstances or consent. Commonwealth v. Sanna, 424 Mass. 92, 96 (1997) (quotations and citations omitted). In order to justify a warrantless arrest “the Commonwealth must show consent unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of lawful authority.” Id. at 97 (quotations and citations omitted).
Consent may be given by a person who possesses actual authority over the area or, based on the totality of the circumstances, possesses apparent authority over the area or effects to be searched. Commonwealth v. Maloney, 399 Mass. 785, 787-88 (1987); Commonwealth v. Wahlstrom, 375 Mass. 115, 118 (1978). The test for apparent authority is whether, possessed with the facts known to the police at the time of the search, a person of reasonable caution would believe that the consenting party had authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 188 (1990); Commonwealth v. Rogers, 444 Mass. 234, 249 (2005).
Horn was a resident of the first-floor apartment at 1 Vernon Terrace and had actual authority to allow police to enter her apartment. See Commonwealth v. Eagles, 419 Mass. 825, 832 (1995) (common authority to give consent exists in co-resident). She also had reasonable apparent authority to admit the police officers. See Maloney, 399 Mass. at 787-88 (boyfriend appeared to be lawful occupant with authority to permit police to enter); Wahlstrom, 375 Mass. at 117 (defendant’s employee had sufficient appearance of authority to consent to search). She was not coerced by Remillard and did not acquiesce to his claim of authority. She freely and voluntarily consented to the officers’ entiy into her apartment. The officers’ entiy into the apartment was lawful.
3. The Protective Sweep
Generally, where the defendant has a reasonable expectation of privacy, police must have a warrant to search a person, his belongings, or his home. Exceptions to this rule arise when the benefits to the public outweigh the individual’s privacy right. Maryland v. Buie, 494 U.S. 325, 336-37 (1990). One exception to this rule is a protective sweep conducted in conjunction with the arrest of an individual in a residence. Id. at 327. “A ‘protective sweep’ is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others.” Id. at 331. The scope of a protective sweep must be limited to its purpose and “may extend only to a cursoiy inspection of those spaces where a person may be found.” Id. at 335.
If a dwelling in which an arrest is made is reasonably suspected to harbor others who might pose a danger to “the safety of the police,” arresting officers may conduct a “protective sweep” or “security check” of the premises. Commonwealth v. Bowden, 379 Mass. 472, 478 (1980). The searching officers must “possess! 1 a reasonable belief based on ‘specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant! ]’ the officers in believing, that the area swept harbored an individual posing a danger to the officer[s] or others.” Buie, 494 U.S. at 327 (quotations and citations omitted).
Remillard and the other officers were investigating a violent crime for which they had multiple suspects. One victim had been stabbed and the police could expect at least one of the suspects to be armed with a knife or similar weapon. While at 1 Vernon Terrace, the officers saw four men fitting the description of the suspects through the window of the first-floor apartment. When they entered that apartment, the officers saw only two of the suspects. These facts, along with other circumstances, gave rise to a reasonable suspicion that the apartment or the adjoining common areas might harbor others posing a danger to the officers. Remillard’s walk around the apartment and check of the rear common area stairs did not exceed the scope of a protective sweep because the search only extended to a cursoiy inspection of those spaces where a person may be found. See id. at 335; Bowden, *175 379 Mass. at 478 (protective sweep of dwelling, including common area basement, valid because it was reasonably necessary to ensure the personal safety of the arresting officer).
That the formal arrest took place after the protective sweep is not determinative. United States v. Lawlor, 406 F.3d 37, 41 n.4 (1st Cir. 2005) (warrantless search upheld where, in response to report of a gunshot and altercation, police officer conducted protective sweep of premises for additional assailant with a gun prior to formally arresting defendant). “Fact that a search precedes a formal arrest is not important, as long as probable cause [to arrest] existed independent of the results of the search.” Commonwealth v. Brillante, 399 Mass. 152, 154-55 n.5 (1987) (citations omitted). Here it does not matter that Cortes was not formally arrested until after the sweep of the apartment and common areas “because there was probable cause to arrest prior to the sweep and the arrest occurred immediately after the sweep.” Lawlor, 406 F.3d at 41 n.4.
Under G.L.c. 276, §1, which is more restrictive than the Fourth Amendment and Art. 14, a search incident to arrest may be made only to remove any weapons that the arrestee might use to resist arrest or effect his escape and to seize evidence of the crime for which the arrest was made in order to prevent its destruction or concealment. Commonwealth v. Blevines, 438 Mass. 604, 607 (2003). The search’s permissible scope is limited to the defendant’s physical person and the area under his immediate control, as measured by the “wingspan” test. Chimel v. California, 395 U.S. 752, 763 (1969); Brillante, 399 Mass. at 155-56. “The wingspan is the area of immediate physical control of the arrestee or the area that may fairly be deemed an extension of the person." Chimel 395 U.S. at 763.
After he was arrested, Cortes requested a sweatshirt to wear and identified the sweatshirt that he wanted. The firearm and bullets were discovered when Smith conducted a search of the identified sweatshirt to remove any weapons that Cortes might access when the sweatshirt came under Cortes’s physical control. The search of the sweatshirt is justified as a search incident to a lawful arrest. See G.L.c. 276, §1.
ORDER
The defendant Christian Cortes’s Motion to Suppress is DENIED.

 Despite the absence of direct evidence on this issue, the court infers that police would have almost immediately tried to determine the identity of these two individuals encountered under highly suspicious circumstances.