SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Christopher Radel (A-44-20) (085129)**
**State v. Keith Terres (A-45-20) (084778)**

**Argued September 27, 2021 -- Decided January 20, 2022**

**ALBIN, J., writing for a unanimous Court.**

These consolidated appeals present an issue of first impression. The Court considers whether the police have a right to conduct a protective sweep of a home when an arrest is made outside the home and, if so, the requisite justification for a warrantless entry and protective sweep. In doing so, the Court balances two important values: an individual's fundamental privacy right in the home and the significant state interest in officer safety.

Radel: In June 2011, defendant Christopher Radel pled guilty to a weapons offense. In March 2015, the trial court sentenced Radel to a probationary term with credit for two days served in custody. In October 2015, the court entered an order directing in part that "members of Little Falls Police Department respond to [Radel's] home, located at 103 Browertown Road in the Township of Little Falls, immediately upon receipt of a copy of this Order, for the limited purpose of retrieving" any firearms, including a Beretta. (emphasis added). The Prosecutor's Office faxed the order to Sergeant Robert Prall more than two months after entry of the order. Before carrying out the order twelve days later, Sergeant Prall learned that Radel resided at 81 Browertown Road; that Radel had two active municipal arrest warrants; and that -- based on a firearms registry search -- Radel possessed firearms other than the Beretta listed on the order. On January 19, 2016, Sergeant Prall set in motion a plan to enforce the order to retrieve weapons and arrest Radel on the outstanding warrants.

At 10 a.m., seven Little Falls police officers positioned themselves to surveil both 103 and 81 Browertown Road, which were separated by only two other houses. Within ten minutes of the start of the surveillance, a sergeant heard a very loud metallic bang coming from the backyard of 81 Browertown and, almost simultaneously, saw a person "wearing something blue" enter the rear door of the residence. Less than ten minutes after the sergeant's sighting of a blue-clad person in the backyard, Radel walked out the front door of 81 Browertown, wearing a blue coat and carrying a laundry basket. Radel placed the basket in the backseat of his car, which was parked in the driveway. When Radel turned around, a detective arrested and handcuffed him. He did not resist.

1

Sergeant Prall hoped to secure Radel's consent to search his house but determined that Radel's impaired condition due to alcohol or drugs ruled out that option. Sergeant Prall ordered a protective sweep of 81 Browertown for purposes of officer safety because there were weapons and other persons "potentially on the property." Sergeant Prall came to that conclusion because two vehicles were parked in the driveway; the home's windows had coverings, obstructing a view into the residence; the blue-jacketed person the other sergeant observed in the backyard may not have been the same person who exited the front door; and the order directed the officers to retrieve the firearms.

During the approximately five-minute sweep, no one was found inside. In carrying out the sweep, however, the officers observed in plain view imitation firearms, butterfly knives, hatchets, bows and arrows, a ballistic vest, simulated police identification badges, marijuana, drug paraphernalia, a glass pipe, and a safe capable of storing firearms. The police transported Radel to headquarters and secured the residence. After obtaining a search warrant, the police found multiple weapons, drugs and related paraphernalia, and over $8,000 in cash.

The trial court denied Radel's motion to suppress the evidence, and the Appellate Division reversed, finding "no support for the [trial court's] conclusion that the police had a reasonable and articulable suspicion that there were other persons inside the home or that they posed a risk to the police or others." 465 N.J. Super. 65, 78 (App. Div. 2020). The Court granted certification. 245 N.J. 466 (2021).

Terres: On September 11, 2017, a Superior Court judge issued a warrant for Tyler Fuller's arrest. Detective John J. Petrosky, a member of the Gloucester County Prosecutor's fugitive unit, learned that Fuller might be staying with defendant Keith Terres at the Ca Nook Trailer Park in Salem County and spoke with Trooper Richard Hershey to coordinate efforts to arrest Fuller. Trooper Hershey told Detective Petrosky that Terres was in the custody of the State Police and had been arrested for possessing "a large amount of narcotics." Thereafter, Trooper Hershey learned from Terres that Fuller might be staying in the first building to the right in the trailer park.

On the morning of September 14, Detective Petrosky and Sergeant Koller of the Prosecutor's Office, accompanied by Trooper Hershey and Trooper Smith, went to the trailer park to arrest Fuller. The four officers went directly to the front building where Terres had said Fuller might be found. As Detective Petrosky and Trooper Hershey approached the front door, which was wide open, they observed two men inside, later identified as Mark Boston and William Willis. As soon as Petrosky announced their presence, Boston ran toward a bedroom. Detective Petrosky pursued him, believing that he might be Fuller, while Trooper Hershey stayed with Willis. In the bedroom, which was littered with loose bullets and shell casings, Detective Petrosky struggled with Boston and eventually handcuffed him. A computer check revealed that both Boston and Willis had outstanding warrants for their arrest.

2

Willis identified a photograph of Fuller shown to him and indicated that Fuller could be found in a back trailer. Willis stated that, minutes earlier, he had seen Fuller there with another male. The officers knew that the trailer described by Willis belonged to Terres. Willis warned the officers to "be careful. . . . There's two males back there." Sergeant Koller and Trooper Smith took charge of Boston and Willis while Detective Petrosky and Trooper Hershey proceeded to Terres's trailer two hundred yards away.

Once there, Detective Petrosky and Trooper Hershey split up to cover different sides of the trailer. Peering through one of the trailer's windows, Detective Petrosky observed Fuller talking to a woman later identified as Allison Terres. Petrosky yelled to Fuller to get to the ground and that he was under arrest. Disobeying that command, Fuller ran through the front door. He was intercepted by Trooper Hershey, who got Fuller face down and handcuffed on the trailer's deck within five feet of the door and attempted to pull a hypodermic needle from Fuller's pants pocket.

Ms. Terres said no one else was inside, and Detective Petrosky instructed her to move outside the doorway. Detective Petrosky shouted into the trailer, commanding that anyone inside was to come to the front door. With no response, Detective Petrosky stepped into the trailer and saw a cross bow hanging inside and arrows scattered about. He conducted a quick search of each room for the presence of the other man earlier mentioned by Willis. During the sweep, Detective Petrosky observed a hole in the floor partially covered by plywood. The hole appeared large enough for a person to hide under the residence. When Petrosky looked into the hole, he saw a handgun and the barrels of either shotguns or rifles. He did not touch any of the weapons. The sweep of the trailer lasted approximately three to five minutes. Law enforcement officers secured the trailer overnight as Trooper Hershey applied for a search warrant. The next day, a search warrant was issued, and multiple weapons were seized from Terres's trailer.

The trial court denied Terres's motion to suppress the evidence, and the Appellate Division affirmed. After initially denying certification, 244 N.J. 309 (2020), the Court granted both Terres's motion for reconsideration and his petition, 245 N.J. 471 (2021).

**HELD:** When an arrest occurs outside a home, the police may not enter the dwelling or conduct a protective sweep in the absence of a reasonable and articulable suspicion that a person or persons are present inside and pose an imminent threat to the officers' safety. This sensible balancing of the fundamental right to privacy in one's home and the compelling interest in officer safety will depend on an objective assessment of the particular circumstances in each case, such as the manner of the arrest, the distance of the arrest from the home, the reasonableness of the officers' suspicion that persons were in the dwelling and likely to launch an imminent attack, and any other relevant factors. A self-created exigency by the police cannot justify entry into the home or a protective sweep. Here, a protective sweep was not warranted in the Radel case but was constitutionally justified in the Terres case.

3

1.  The fundamental privacy interests of the home are at the very core of the protections afforded by our Federal and State Constitutions, and the warrantless search of a home is permissible only if the search falls within one of the few specifically established and well-delineated exceptions to the warrant requirement.  One such exception is the protective sweep doctrine.  In Maryland v. Buie, the United States Supreme Court recognized that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf'" and in possible jeopardy of "[a]n ambush in a confined setting of unknown configuration."  494 U.S. 325, 333 (1990).  The Court set forth a two-tiered standard governing the scope of a protective search of a residence during an in-home arrest:  (1) "[O]fficers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"; and (2) officers could search beyond those adjoining areas based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Id. at 334.  (pp. 27-30)

2.  The New Jersey Supreme Court has also placed strict limits on the scope of the protective-sweep doctrine when, in a non-arrest context, police officers are "lawfully" in a home "for a legitimate purpose," such as by consent.  State v. Davila, 203 N.J. 97, 102-03 (2010).  In that scenario, "[a] protective sweep may only occur when . . . the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger."  Id. at 102.  Even so, a "sweep will be upheld only if (1) it is conducted quickly; and (2) it is restricted to places or areas where the person posing a danger could hide."  Ibid.  (pp. 30-31)

3.  Although the United States and New Jersey Supreme Courts have not had occasion to determine whether and in what form the protective-sweep doctrine permits a warrantless entry into a home when an arrest occurs directly outside the home, many federal circuit courts of appeals and state courts have spoken to the issue and have determined that such sweeps must be evaluated under the second Buie prong.  (pp. 31-34)

4.  The Court finds that, in balancing the fundamental privacy rights afforded to the home under the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution and the unquestionable need to ensure officer safety when an arrest is made in the area immediately outside a home, the justification for entry into the home to conduct a protective sweep must be based on the second prong in Buie -- whether the officers have a reasonable and articulable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene," 494 U.S. at 334.  Whether police officers making an arrest just outside a home have a reasonable and articulable suspicion of a safety threat necessitating a protective sweep of parts or all of the residence will depend on the facts known to the officers at the time.  Courts must look at the totality of the circumstances to determine if there is an individualized, rather than generalized,

4

suspicion, understanding that there is no mathematical formula to determine what amount of suspicion is reasonable. The Court reviews in detail decisions from other jurisdictions and notes that courts have focused on the quantity and quality of the articulable facts that prompted the sweep. (pp. 34-37)

5. Whether a "reasonably prudent officer," who has arrested a suspect outside a home, has sufficient "articulable facts" to form an objectively reasonable belief "that the area to be swept harbors an individual posing a danger to those on the arrest scene" will depend on the totality of the evidence. See Buie, 494 U.S. at 334. Entry into a home without a warrant is presumptively unreasonable and therefore not the norm. A protective sweep is an exception to the warrant requirement and a species of exigent circumstances. The State bears the burden of proving the necessity of entering the home to conduct a protective sweep. Some factors that may be considered in determining whether a protective sweep is justified when an arrest is made outside the home are (1) whether the police have information that others are in the home with access to weapons and a potential reason to use them or otherwise pose a dangerous threat; (2) the imminence of any potential threat; (3) the proximity of the arrest to the home; (4) whether the suspect was secured or resisted arrest and prolonged the police presence at the scene; and (5) any other relevant circumstances. Entry into the home and a protective sweep cannot be based on a self-created exigency by the police. See Davila, 203 N.J. at 103. (pp. 37-38)

6. In Radel, the police executed a controlled arrest in the driveway -- a distance from the home's entrance -- with watchful eyes on the front and rear doors of the house. The officers did not face a discernible threat. The officers had no specific information that another person was in the house, nor was there information from which they could reasonably infer that someone inside posed an imminent danger. Nothing unforeseeable occurred at the scene; no danger arose that mandated an entry of the home without a warrant. Therefore, a protective search was not justified under Buie. (pp. 39-42; 45)

7. On the other hand, in Terres, the officers faced unexpected and fast-evolving circumstances that signaled danger and the need for prompt action to safeguard their lives. The officers received a warning to be careful and that another male was with Fuller in Terres's trailer -- a clear signal of a potential threat; they had been told that Fuller was staying in a building where loose bullets and shell casings were observed; Fuller fled the trailer when he was arrested within feet of the open front door; and the situation was fluid and not stabilized as Trooper Hershey attempted to retrieve a hypodermic needle from Fuller's pocket. Those specific and articulable facts in Terres provided a reasonable basis for entry into the home based on a very real and potential danger. (pp. 42-45; 45-46)

**AFFIRMED in both appeals. REMANDED to the trial court in Radel.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

5

SUPREME COURT OF NEW JERSEY
A-44 September Term 2020
A-45 September Term 2020
085129 and 084778

State of New Jersey,

Plaintiff-Appellant,

v.

Christopher Radel a/k/a Christoph R. Radel,
Christpoh R. Radel, and Christohe R. Radel,

Defendant-Respondent.

State of New Jersey,

Plaintiff- Respondent,

v.

Keith Terres,

Defendant-Appellant.

State v. Christopher Radel (A-44-20):
On certification to the Superior Court,
Appellate Division, whose opinion is reported at
465 N.J. Super. 65 (App. Div. 2020).

State v. Keith Terres (A-45-20):
On certification to the Superior Court,
Appellate Division.

1

| Argued | Decided |
|---|---|
| September 27, 2021 | January 20, 2022 |

Deborah Bartolomey, Deputy Attorney General, argued the cause for appellant in State v. Radel (A-44-20) (Andrew J. Bruck, Acting Attorney General, attorney; Deborah Bartolomey, of counsel and on the briefs).

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for respondent in State v. Radel (A-44-20) (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant in State v. Terres (A-45-20) (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

David M. Galemba, Special Deputy Attorney General/Assistant Salem County Prosecutor, argued the cause for respondent in State v. Terres (A-45-20) (John T. Lenahan, Salem County Prosecutor, attorney; David M. Galemba, of counsel and on the briefs).

Deborah Bartolomey, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Christopher Radel (A-45-20) (Andrew J. Bruck, Acting Attorney General, attorney; Sarah D. Brigham, Deputy Attorney General, of counsel and on the briefs).

Jason LeBoeuf argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Radel (A-44-20), and State v. Keith Terres (A-45-20) (Zeigler, Resnick & Epstein, attorneys; Law Offices of Robert J. De Groot, attorneys; and Fox Rothschild, attorneys; Jason LeBoeuf, Oleg Nekritin, and Matthew S. Adams, on the brief).

2

One of the most valued of all constitutional rights is the right to be free from unreasonable searches of one's home. State v. Brown, 216 N.J. 508, 526 (2014). Because of the special status of the home in our constitutional jurisprudence, the warrantless search of a home is presumptively unreasonable. State v. Edmonds, 211 N.J. 117, 121 (2012). The warrant requirement, however, is subject to exceptions. One such exception allows law enforcement officers, who make an arrest inside a home, to conduct a warrantless sweep of the dwelling to prevent other occupants from potentially launching an attack against them. State v. Cope, 224 N.J. 530, 546-47 (2016). To conduct a sweep beyond the area contiguous to where the arrest occurred, the officers must possess a reasonable and articulable suspicion of the presence of one or more occupants in the home who pose an imminent threat to their safety. Id. at 547; see also State v. Bryant, 227 N.J. 60, 71 (2016); Maryland v. Buie, 494 U.S. 325, 334 (1990).

The two consolidated appeals before us present different scenarios. In both cases, police officers, armed with arrest warrants, apprehended the suspects outside of homes -- defendant Christopher Radel as he carried laundry to his car parked in his driveway, and Tyler Fuller as he was brought to the

ground on the front porch of defendant Keith Terres's mobile home from which he had fled.  The police conducted protective sweeps of the homes based on claims of officer safety and, though discovering no one inside the dwellings, observed in plain view weapons in both homes, and also drugs in Radel's home.

The trial judges presiding over those cases denied defendants' motions to suppress the evidence uncovered during the protective sweeps.  In the Radel case, the Appellate Division reversed, finding that the protective sweep did not pass constitutional muster.  In the Terres case, the Appellate Division affirmed, concluding that officer safety justified an immediate protective sweep.

Based on our review of the different factual scenarios presented in Radel and Terres, we now uphold the conclusions reached by the Appellate Division in both cases.  First, when an arrest occurs outside a home, the police may not enter the dwelling or conduct a protective sweep in the absence of a reasonable and articulable suspicion that a person or persons are present inside and pose an imminent threat to the officers' safety.  See, e.g., United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996).  Entering a home to conduct a protective sweep when an arrest is made outside a dwelling should be the rare circumstance, in light of the

4

special constitutional protections afforded the home. Nevertheless, when objective facts provide the police with a reasonable and articulable suspicion that their lives may be placed in imminent danger by a person or persons inside the home, officers will be justified in entering the dwelling to carry out a protective sweep to safeguard their lives.

Second, this sensible balancing of the fundamental right to privacy in one's home and the compelling interest in officer safety will depend on an objective assessment of the particular circumstances in each case, such as the manner of the arrest, the distance of the arrest from the home, the reasonableness of the officers' suspicion that persons were in the dwelling and likely to launch an imminent attack, and any other relevant factors. A self-created exigency by the police cannot justify entry into the home or a protective sweep. See State v. Davila, 203 N.J. 97, 103 (2010).

The two cases before us present bookends -- one in which a protective sweep was not warranted, the Radel case, and the other in which a sweep was constitutionally justified, the Terres case. As explained in this opinion, the judgments of the Appellate Division are affirmed.

I.

State v. Radel

A.

A Passaic County grand jury returned an eighty-eight-count indictment against Radel for drug and weapons offenses. Those charges were based on evidence discovered during two searches of Radel's home, one without a warrant, and a later one with a warrant.

The first search -- a warrantless protective sweep of Radel's home -- is the subject of this appeal. Radel filed a motion to suppress all evidence uncovered during the allegedly unconstitutional sweep. He also claimed that the later-issued search warrant was secured by the use of the fruits of the initial unlawful entry into his home. The record is based on the testimony from three Little Falls police officers -- Sergeant Robert Prall (Prall), Sergeant Bryan Prall (B. Prall),[1] and Detective John Moncato -- as well as from Radel at the motion-to-suppress hearing.

B.

In June 2011, pursuant to an agreement with the Passaic County Prosecutor's Office, Radel pled guilty to second-degree possession of a

---

[1] Sergeants Robert and Bryan Prall are brothers.

weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).  In March 2015, the trial court sentenced Radel to a probationary term with credit for two days served in custody.  Additionally, on October 27, 2015, the court entered an order (1) revoking Radel's "firearm purchaser identification cards for any and all firearms," including for a Smith & Wesson handgun and a Beretta handgun; (2) instructing Radel to surrender those cards to the State Police Superintendent within ten days of entry of the order; and (3) directing that "members of Little Falls Police Department respond to [Radel's] home, located at 103 Browertown Road in the Township of Little Falls, immediately upon receipt of a copy of this Order, for the limited purpose of retrieving" any firearms, including the Beretta.  (emphasis added).

The Prosecutor's Office faxed the order to Sergeant Robert Prall on January 7, 2016, more than two months after entry of the order.  Before carrying out the order twelve days later, Sergeant Prall did some background work.  He learned that Radel resided at 81 Browertown Road, not 103 Browertown Road; that Radel had two active municipal arrest warrants with bail set at $500 each for failure to appear in municipal court for a traffic violation and criminal offense; and that -- based on a firearms registry search -- Radel possessed firearms other than the Beretta listed on the order.  On

January 19, 2016, Sergeant Prall set in motion a plan to enforce the order to retrieve weapons and arrest Radel on the outstanding warrants.

That day, Sergeant Prall met in advance with six officers who would participate in the operation. He also spoke by telephone with Radel's mother, who resided at 103 Browertown Road, in an effort to pinpoint Radel's whereabouts, but that did not prove helpful.

At 10 a.m., seven Little Falls police officers positioned themselves to surveil both 103 and 81 Browertown Road, which were separated by only two other houses.[2] Within ten minutes of the start of the surveillance, Sergeant B. Prall heard a very loud metallic bang coming from the backyard of 81 Browertown and, almost simultaneously, saw a person "wearing something blue" enter the rear door of the residence. According to Detective John Moncato's later-prepared warrant affidavit, Sergeant B. Prall explained that the man was "wearing a blue jacket." Although Sergeant B. Prall could not identify the person he momentarily observed, he relayed the information to Detective Moncato, who was covering the front of the house.

Less than ten minutes after Sergeant B. Prall's sighting of a blue-clad person in the backyard, Radel walked out the front door of 81 Browertown, wearing a blue coat and carrying a laundry basket. Radel placed the basket in

---

[2] The parking lot of a high school was located behind 81 Browertown.

the backseat of his car, which was parked in the driveway. When Radel turned around, Detective Moncato arrested and handcuffed him. He did not resist.

Sergeant Prall -- the officer in charge -- hoped to secure Radel's consent to search his house but determined that Radel's impaired condition due to alcohol or drugs ruled out that option. In response to Prall's questioning, Radel indicated that he had surrendered or sold certain weapons that the sergeant identified. Sergeant Prall was not reassured.[3]

Sergeant Prall ordered a protective sweep of 81 Browertown for purposes of officer safety because there were weapons and other persons "potentially on the property." Sergeant Prall came to that conclusion because two vehicles were parked in the driveway, suggesting the presence of another person on the premises; the home's windows had coverings, obstructing a view into the residence; the blue-jacketed person Sergeant B. Prall observed in the backyard may not have been the same person wearing a blue jacket (Radel) who exited the front door; and the order directed the officers to retrieve the firearms.

---

[3] Radel gave a different account. He testified that when Sergeant Prall asked him to consent to the search of his home, he responded, "Absolutely no," and refused to sign the consent form.

Three officers entered through the "partly open" front door and searched every room where a person might be located. During the approximately five-minute sweep, no one was found inside. In carrying out the sweep, however, the officers observed in plain view imitation firearms, butterfly knives, hatchets, bows and arrows, a ballistic vest, simulated police identification badges, marijuana, drug paraphernalia, a glass pipe, and a safe capable of storing firearms.[4] At the rear of the property, Detective Moncato also conducted a protective sweep of a detached garage and observed a closed white backpack.

The police transported Radel to headquarters and secured the residence. Detective Moncato then applied for and was issued a warrant to search Radel's house, detached garage, and vehicle for firearms; controlled dangerous substances; drug paraphernalia; and money related to illegal drug sales. During the search, the police seized, among other things, seven rifles; two shotguns; four handguns; numerous rounds of ammunition; other weapons, including a cross bow and arrows and butterfly knives; drugs and related paraphernalia; and $8,320 in cash.

---

[4] Those observations were provided in Sergeant B. Prall's testimony and Detective Moncato's affidavit in support of a search warrant. After the protective sweep, Sergeant Prall spoke with Radel's father, who told him that his son stored weapons in a gun safe at 81 Browertown.

10

## C.

The trial court denied the motion to suppress, determining that the entry and search of Radel's residence was justified under the protective-sweep doctrine. In reaching that conclusion, the court credited the testimony of the Little Falls police officers and held that the State satisfied the two-prong protective-sweep analysis set forth in <u>Davila</u>. The court acknowledged that the first prong of <u>Davila</u> requires that the officers be lawfully on the premises for a legitimate purpose before the onset of the protective sweep. It nevertheless found that, despite Radel's arrest outside his residence, that prong extended to the circumstances presented here. The court also determined that the State met the second <u>Davila</u> prong because "the police had a reasonable, and articulable, suspicion that there might be a danger to them, or, to others in the neighborhood." The court made that finding based on the totality of the circumstances -- "the noise that they heard in the backyard" sounded like a "gunshot," "the movements of an individual" into and out of the residence, Radel's "contradictory answers to the police," the presence of an "extra car in the driveway," and Radel's prior conviction.

D.

After the denial of the motion to suppress, Radel entered into a plea agreement with the State.[5]  As part of the agreement, Radel pled guilty to one count of second-degree unlawful possession of a handgun and one count of second-degree certain persons not to possess weapons.

On January 14, 2019, the trial court sentenced Radel to an extended term of fifteen years in prison with a seven-and-a-half-year period of parole ineligibility for the unlawful possession of a handgun offense and to a consecutive ten-year term with a five-year parole disqualifier for the certain persons offense.  The court also imposed fines and penalties.  In accordance with the plea agreement, the court dismissed the remaining charges.

Radel appealed the denial of his motion to suppress.

E.

In an opinion authored by Judge Fisher, the Appellate Division reversed and held that there was "no support for the [trial court's] conclusion that the police had a reasonable and articulable suspicion that there were other persons inside the home or that they posed a risk to the police or others."  State v.

---

[5]  The court granted Radel's motion to dismiss six counts of the indictment and the State's application to amend seven other counts.

Radel, 465 N.J. Super. 65, 78 (App. Div. 2020).[6]  The Appellate Division rejected the trial court's analysis that the Little Falls police officers were "lawfully" in Radel's house for a "legitimate purpose," as required by Davila's first prong.  Id. at 71-72 (citing Davila, 203 N.J. at 125).  It stressed that the "municipal warrants only provided authority to arrest [Radel]" and that after Radel was arrested and handcuffed outside his residence, "the officers had no further legitimate purpose for remaining on the property."  Id. at 72.  It also pointed out that the forfeiture order did not authorize a search of 103 Browertown, the only address listed on the order, much less 81 Browertown, Radel's actual residence.  Ibid.

Additionally, the Appellate Division concluded that the State had not "sufficiently demonstrated the officers had a reasonable and articulable suspicion that the place to be swept harbored a danger," as required under the second Davila prong.  Ibid.  According to the appellate court, the circumstances presented to the police officers did not give rise to a reasonable suspicion that a second individual or a weapon were inside 81 Browertown Road posing a risk to officers.  Id. at 72, 78.  For example, it dismissed the trial court's findings that the loud metallic bang suggested the presence of a

[6]  That determination, according to the Appellate Division, made it unnecessary to address four other issues raised by Radel.  465 N.J. Super. at 69 n.1.

13

gun on the premises or that the officers could rely on the October 27 forfeiture order authorizing the retrieval of a gun at 103 Browertown as a basis to conclude that three months later a gun would be located on the premises of 81 Browertown. Id. at 77.

The Appellate Division also determined that police did not have a sufficient basis to believe that a second person was in the residence. Id. at 78. It indicated that the officers' observations suggested that Radel was the person who entered the rear of 81 Browertown and ten minutes later exited the front door. Id. at 73-74, 78. It, moreover, concluded that the extra car in the driveway "suggests little." Id. at 78. Last, the Appellate Division did not find that the record supported the trial court's finding that Radel gave contradictory statements to the police. Ibid.

Accordingly, the Appellate Division vacated the order denying Radel's motion to suppress and remanded the matter to the trial court for the purpose of determining whether the warrant affidavit -- absent the information unlawfully secured from the protective sweep -- provided a sufficient basis for the issuance of a search warrant of Radel's residence. Id. at 78-79.

We granted the State's petition for certification. 245 N.J. 466 (2021). We also granted the motion of the Association of Criminal Defense Lawyers of New Jersey (ACDL-NJ) to participate as amicus curiae.

14

F.

1.

The State claims that the Appellate Division erroneously adopted a "bright-line rule" that a protective sweep is not justified when an arrest occurs outside a home. Such a categorical rule, it asserts, is an "outlier" among federal and state courts. The State, moreover, posits that the protective-sweep doctrine articulated in <u>Maryland v. Buie</u> "is not expressly limited to arrests that take place inside the home." It cites cases in support of the proposition that "[e]xigent circumstances accompanying an arrest just outside a residence may make it reasonable to enter the home without a warrant to conduct a protective sweep." The State concedes that "[t]he exigency cannot be police-created; rather it must be unforeseen and spontaneous," citing <u>Davila</u>, 203 N.J. at 127.

According to the State, the police had "ample probable cause" -- before the entry into Radel's home and the protective sweep -- to believe that the residence contained an illegal gun. The State submits that, as explained by the trial court, the police had a reasonable and articulable belief that Radel's home "harbor[ed] someone posing a danger," which justified a protective sweep, citing <u>Buie</u>, 494 U.S. at 334.

15

2.

Radel argues that the warrantless search of his home did not comply with the protective-sweep doctrine and therefore the Appellate Division's suppression order should be affirmed. According to Radel, a protective sweep of a home is justified only when police officers are already lawfully within the premises and "have a reasonable [and] articulable suspicion that the area to be swept harbors an individual posing a danger," quoting Davila, 203 N.J. at 125. Radel submits that a warrantless entry into a home can be justified only in narrow circumstances, such as exigent circumstances when a police officer faces a "serious and imminent danger" that requires immediate action for the preservation of life. The protective sweep in this case, Radel asserts, was based not on objectively grounded facts, but rather on an "unreasonable fear" that someone within the home presented an immediate danger to the officers stationed outside.

Radel also contends that a remand to the trial court for further proceedings is unnecessary because, after excising from Detective Moncato's affidavit the information acquired from the unlawful protective sweep, Moncato's application for a search warrant is not supported by probable cause.

Amicus ACDL-NJ, echoing most of the arguments advanced by Radel, expresses the fear that expanding the protective-sweep doctrine will lead to

16

unjustified entries into homes of inner-city residents, heighten tensions between the public and police, and increase the likelihood of violent confrontations.

## II.

## State v. Terres

### A.

A Salem County grand jury returned a thirteen-count indictment against Terres, charging him with weapons and drug offenses, including second-degree possession of a firearm while committing a drug offense, N.J.S.A. 2C:39-4.1(a), and second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b)(1). In a second indictment, Terres was charged with a single count of third-degree receiving stolen property, N.J.S.A. 2C:20-7(a).

Terres filed a motion to suppress all evidence discovered during a warrantless protective sweep of his mobile home. At the motion to suppress hearing, two witnesses testified -- Detective John J. Petrosky of the Gloucester County Prosecutor's Office and Trooper Richard Hershey of the New Jersey State Police. The record before us is based on their testimony.

### B.

On September 11, 2017, a Gloucester County Superior Court judge issued a warrant for Tyler Fuller's arrest for his failure to abide by the terms of

17

his pre-trial release and to appear in court on a third-degree theft charge. The warrant included Fuller's last known address in Franklin Township, Gloucester County. Detective Petrosky, a member of the Gloucester County Prosecutor's fugitive unit, went to that address and learned that Fuller might be staying with Terres at the Ca Nook Trailer Park in Salem County. Because the trailer park was located in another county and within the jurisdiction of the Woodstown State Police Barracks, on September 13, Detective Petrosky spoke with Trooper Hershey to coordinate efforts to arrest Fuller. Trooper Hershey told Detective Petrosky that Terres was in the custody of the State Police and had been arrested for possessing "a large amount of narcotics."

Thereafter, Trooper Hershey learned from Terres that Fuller might be staying in the first building to the right in the trailer park. Trooper Hershey gave that information to Detective Petrosky who, that evening, visited that building but got no response when he knocked on the door.

On the morning of September 14, Detective Petrosky was informed that, two days earlier, Fuller had removed the electronic bracelet he had been wearing and that the bracelet had registered his last location as the Ca Nook Trailer Park. That same morning, Detective Petrosky and Sergeant Koller of

the Prosecutor's Office, accompanied by Trooper Hershey and Trooper Smith, went to the trailer park to arrest Fuller.[7]

The four officers went directly to the front building where Terres had said Fuller might be found. As Detective Petrosky and Trooper Hershey approached the front door, which was wide open, they observed two men inside, later identified as Mark Boston and William Willis. As soon as Petrosky announced their presence, Boston ran toward a bedroom. Detective Petrosky pursued him, believing that he might be Fuller, while Trooper Hershey stayed with Willis. In the bedroom, which was littered with loose bullets and shell casings, Detective Petrosky struggled with Boston and eventually handcuffed him. A computer check revealed that both Boston and Willis had outstanding warrants for their arrest.

Willis identified a photograph of Fuller shown to him and indicated that Fuller could be found in a back trailer. Willis stated that, minutes earlier, he had seen Fuller there with another male. The officers knew that the trailer described by Willis belonged to Terres. Willis warned the officers to "be careful. . . . There's two males back there." Sergeant Koller and Trooper

---

[7] Trooper Hershey testified that the trailer park was known to have a high incidence of criminal activity.

19

Smith took charge of Boston and Willis while Detective Petrosky and Trooper Hershey proceeded to Terres's trailer two hundred yards away.

Once there, Detective Petrosky and Trooper Hershey split up to cover different sides of the trailer. Peering through one of the trailer's windows, Detective Petrosky observed Fuller talking to a woman later identified as Allison Terres. Petrosky yelled to Fuller to get to the ground and that he was under arrest. Disobeying that command, Fuller ran through the front door where he was intercepted by Trooper Hershey. When Detective Petrosky came to assist, Trooper Hershey had Fuller face down and handcuffed on the trailer's deck within five feet of the front door. At that moment, Hershey was attempting to pull a hypodermic needle from Fuller's pants pocket as Ms. Terres stood by the open door, holding a baby.

Detective Petrosky stepped over Trooper Hershey, who was still trying to secure the needle, and asked Ms. Terres, "where's the other male?" When Ms. Terres answered that no one else was inside, Detective Petrosky instructed her to move outside the doorway. Detective Petrosky shouted into the trailer, commanding that anyone inside was to come to the front door. With no response, Detective Petrosky stepped into the trailer and saw a cross bow hanging inside and arrows scattered about. He conducted a quick search of each room for the presence of the other man earlier mentioned by Willis.

20

During the sweep, Detective Petrosky observed behind a washer and dryer a three- to four-foot wide and three-foot deep hole in the floor partially covered by plywood. The hole appeared large enough for a person to hide under the residence. When Petrosky looked into the hole, he saw a handgun and the barrels of either shotguns or rifles. He did not touch any of the weapons. The sweep of the trailer lasted approximately three to five minutes.

Law enforcement officers secured the trailer overnight as Trooper Hershey applied for a search warrant. The next day, a search warrant was issued, and multiple weapons were seized from Terres's trailer.

## C.

The trial court denied the motion to suppress, finding that Detective Petrosky had conducted a lawful protective sweep of Terres's trailer. In reaching that conclusion, the court noted that (1) the trailer park was known to be a high crime area; (2) Fuller was arrested immediately outside the trailer, within feet of the doorway; (3) the officers received a warning that another male was inside the trailer and that they should be careful; (4) the officers had reason to believe that the trailer harbored an individual posing a danger; and (5) the sweep was limited in scope and duration. The court further determined that, based on the information acquired during the protective sweep, the search warrant was properly issued.

21

D.

Following the denial of the suppression motion, Terres entered into a plea agreement with the State. Terres pled guilty to second-degree unlawful possession of a handgun and fourth-degree receiving stolen property, downgraded from a third-degree charge. The trial court sentenced Terres to a five-year prison term, subject to a forty-two-month period of parole ineligibility pursuant to N.J.S.A. 2C:43-6(c), on the handgun charge and to a three-year concurrent prison term on the receiving stolen property charge.[8] Additionally, the court imposed fines and penalties. The remaining charges against Terres were dismissed in accordance with the terms of the plea agreement.

Terres appealed the denial of his motion to suppress.

E.

In an unpublished opinion, the Appellate Division affirmed the trial court's order denying the motion to suppress. The Appellate Division first rejected Terres's constitutional challenge to the search of the building where

---

[8] The Appellate Division, noting that the maximum sentence for a fourth-degree offense is eighteen months' imprisonment, remanded for resentencing on the receiving stolen property charge.

Boston and Willis were arrested because the issue was not raised before the trial court and because it lacked merit.[9]

In upholding the constitutionality of the search of Terres's trailer, the Appellate Division determined that the trial court's factual findings were "supported by substantial credible evidence in the record." It acknowledged that New Jersey case law does not address the scenario "where an individual was apprehended just outside of a residence and the protective sweep included the inside of the residence." It nevertheless held "that the protective sweep conducted by Petrosky was lawful," based on principles articulated in Cope, 224 N.J. at 546-47 and Davila, 203 N.J. at 113 -- cases in which the police were already lawfully inside the home before the onset of the sweep.

The Appellate Division emphasized that "[t]he most important fact" was that the detective and trooper apprehended Fuller "just outside the trailer," "on the porch, which was connected to the trailer and arguably part of the residence." According to the Appellate Division, "the zone of danger to the [detective and trooper] included the trailer because the door to the trailer was just several feet away from where [they] were holding Fuller." The protective sweep of the dwelling, it explained, was a constitutionally permissible measure

---

[9] Terres did not raise that issue in his petition for certification, and therefore we need not detail the Appellate Division's reasons for rejecting the issue on the merits.

to ensure the safety of the detective and trooper who were effectuating a valid arrest warrant. The Appellate Division concluded that the search warrant at issue was based on information lawfully obtained during the protective sweep.

After initially denying Terres's petition for certification, 244 N.J. 309 (2020), we granted both Terres's motion for reconsideration and his petition, 245 N.J. 471 (2021). We also granted the motions of the Attorney General and the ACDL-NJ and the National Association of Criminal Defense Lawyers (NACDL) to participate as amicus curiae.[10]

F.

1.

Terres argues that no recognized exception to the warrant requirement permits police officers -- who arrest a suspect outside a home -- to enter the home to conduct a protective sweep solely based on a reasonable and articulable suspicion that their safety is imperiled. Terres stresses that unless the police have "a warrant, exigency or consent to allow them to alleviate their fears," entry into the home is forbidden.

Terres, moreover, contends that the protective sweep here violated the principles of Davila, 203 N.J. at 102-03, because Detective Petrosky was not lawfully inside the trailer before conducting a limited search and because he

---

[10] The ACDL-NJ and NACDL filed a joint brief.

did not have a "sufficient basis to believe the home harbored another individual who posed a danger to the officers."  In his view, the exigency exception to the warrant requirement, which requires officers to have an objectively reasonable basis to believe they are facing an imminent danger, "strikes the appropriate balance between protecting police safety and the privacy of homes."

Terres also claims that, unlike the circuit courts of appeals cases cited by the State, Fuller's arrest outside Terres's home -- a third-party's home -- cannot justify a protective sweep when the officers do not have a sufficient basis to believe that Fuller lived in Terres's residence.[11]

The ACDL-NJ and NACDL advance similar arguments to those presented by Terres.

2.

The State asserts that the dangers confronting police officers making an in-home arrest do not disappear when the arrest is made on the porch of the home, within feet of an open front door.  For that reason, the State urges the

---

[11]  We decline to address the constitutional validity of the officers' entry into the first building because Terres did not raise that issue before the trial court, in his petition for certification, or in his motion for reconsideration.  See State v. Cabbell, 207 N.J. 311, 327 n.10 (2011) (declining to address defendant's claim that was not raised in his petition for certification).

Court to apply the paradigm in <u>Maryland v. Buie</u> to cases where an arrest is made directly outside a home. Under that approach, police officers may conduct a protective sweep in areas within the home "immediately adjoining the place of arrest without any particular justification" and extend the sweep, based on reasonable and articulable suspicion, to areas that may be harboring a dangerous individual. The State catalogues a number of federal and state courts that have applied the protective-sweep doctrine in <u>Buie</u> when arrests were made outside the home.

The State highlights the circumstance in this case that, it claims, "developed spontaneously, without time for 'calm reflection or sustained deliberation' [by] the two officers," quoting <u>State v. Frankel</u>, 179 N.J. 586, 599 (2004). The totality of the circumstances, the State submits, gave Detective Petrosky a reasonable and articulable suspicion to believe that a potentially dangerous individual could have launched an attack from the mobile home.

The Attorney General echoes many of those arguments and adds that the rationale for a protective sweep is no different whether a suspect is arrested at his own home or a third-party's home because the danger to the arresting officers is the same.

III.

A.

We begin with some familiar principles governing appellate review. We should defer to a trial court's factual findings in deciding a motion to suppress, "so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Elders, 192 N.J. 224, 243 (2007) (quotation omitted). In contrast, "our review of legal matters is de novo," and therefore "[w]e owe no deference to a trial or appellate court's interpretation of the law." State v. Hathaway, 222 N.J. 453, 467 (2015) (citing State v. Vargas, 213 N.J. 301, 327 (2013)).

The issue before us is one of first impression. We must determine whether the police have a right to conduct a protective sweep of a home when an arrest is made outside the home and, if so, the requisite justification for a warrantless entry and protective sweep. In doing so, we must balance two important values: an individual's fundamental privacy right in the home and the significant state interest in officer safety.

B.

Both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution ensure "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and

seizures, shall not be violated." "The fundamental privacy interests of the home are at the very core of the protections afforded by our Federal and State Constitutions." Brown, 216 N.J. at 526 (citing State v. Evers, 175 N.J. 355, 384 (2003)). "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6 (2013). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972); see also Brown, 216 N.J. at 526-27 (quoting same).

Thus, the warrantless search of a home is "'presumptively unreasonable' and 'must be subjected to particularly careful scrutiny.'" Edmonds, 211 N.J. at 129 (quoting State v. Bolte, 115 N.J. 579, 585 (1989)). The warrantless search of a home is permissible only if the search falls within "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." Id. at 130 (quoting Frankel, 179 N.J. at 598). "One such exception is the protective sweep doctrine." Bryant, 227 N.J. at 70 (citing Davila, 203 N.J. at 125). "The State bears the burden of proving by a preponderance of the evidence the validity of a warrantless" protective sweep. See Cope, 224 N.J. at 546 (quoting Edmonds, 211 N.J. at 128).

The United States Supreme Court articulated the rationale and contours of a warrantless protective sweep in the case of an in-home arrest in Maryland

28

v. Buie, 494 U.S. 325 (1990). In Buie, armed with an arrest warrant, police officers entered the defendant's home where they arrested him. Id. at 328. While searching the residence for the presence of others, the police discovered evidence incriminating the defendant. Ibid. The defendant challenged the lawfulness of the search. The competing concerns were the defendant's privacy interests in his home, where he was arrested, and the officers' interests in "tak[ing] reasonable steps to ensure their safety after, and while making, the arrest." Id. at 333-34.

In addressing those concerns, the Court recognized that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf'" and in possible jeopardy of "[a]n ambush in a confined setting of unknown configuration." Id. at 333. In such a scenario, officers have an interest in ensuring that the residence "is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Ibid. The Court compared the need for officer-safety precautions in the setting of an in-home arrest to that of an officer's right during a street encounter to conduct a limited pat down of a suspect for weapons when the officer has a reasonable "belief, based on specific and articulable facts, and not on a mere inchoate and unparticularized suspicion or hunch, that he is dealing with an armed and dangerous

29

individual." Id. at 332 (internal quotation marks omitted) (quoting Terry v. Ohio, 392 U.S. 1, 21, 24, 27 (1968)).

The Court set forth a two-tiered standard governing the scope of a protective search of a residence during an in-home arrest: (1) "[O]fficers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"; and (2) officers could search beyond those adjoining areas based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334.

Our Court has also placed strict limits on the scope of the protective-sweep doctrine when, in a non-arrest context, police officers are "lawfully" in a home "for a legitimate purpose," such as by consent. Davila, 203 N.J. at 102-03. In that scenario, "[a] protective sweep may only occur when . . . the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger." Id. at 102. Even so, a "sweep will be upheld only if (1) it is conducted quickly; and (2) it is restricted to places or areas where the person posing a danger could hide." Ibid. Importantly, we warned in Davila that "[t]he police cannot create the danger

that becomes the basis for a protective sweep, but rather must be able to point to dangerous circumstances that developed once the officers were at the scene." Id. at 103.

The distinguishing feature in the case before us is that the arrests occurred outside the homes of Radel and Terres. That is no insignificant factor because, generally, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). The circumstances presented here were not addressed or perhaps anticipated in Buie. The threat to an officer may be no less if the arrest is made five feet within or five feet outside the open door of a home if the officer has a reasonable and articulable suspicion that an individual harboring inside poses an imminent danger. The "radius of danger" facing police officers making an arrest is not lessened by facile distinctions. See Cope, 224 N.J. at 547.

Although the United States Supreme Court and our Court have not had occasion to determine whether and in what form the protective-sweep doctrine permits a warrantless entry into a home when an arrest occurs directly outside the home, many federal circuit courts of appeals and state courts have spoken to the issue.

C.

The United States Third Circuit Court of Appeals in United States v. White held that "a sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis," 748 F.3d 507, 510 (3d Cir. 2014) (quoting Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir. 1997), abrogated on other grounds by Curley v. Klem, 499 F.3d 199, 209 (3d Cir. 2007)), and "that Buie's prong [one] exception is not available," id. at 511. The court emphasized that "the Fourth Amendment draws 'a firm line at the entrance to the house,' which 'must be not only firm but also bright.'" Ibid. (first quoting Payton, 445 U.S. at 590; and then quoting Kyllo v. United States, 533 U.S. 27, 40 (2001)). Guided by that principle, the court reasoned that "[w]hen an arrest occurs just outside of the home, the unassailable public policy of protecting law enforcement officers, as well as victims, bystanders, and even assailants, is appropriately balanced with the Fourth Amendment right to be free of unreasonable searches and seizures by application of Buie's prong [two]." Id. at 513.

Other federal circuit courts of appeals have applied Buie's prong two -- the reasonable and articulable suspicion requirement -- in authorizing a protective sweep of a residence when the arrest is made just outside the home. See, e.g., Lawlor, 406 F.3d at 41 ("[A] protective sweep may be conducted

32

following an arrest that takes place just outside the home, if sufficient facts exist that would warrant a reasonably prudent officer to fear that the area in question could harbor an individual posing a threat to those at the scene." (footnote omitted) (citations omitted)); United States v. Wilson, 306 F.3d 231, 238-39 (5th Cir. 2002) (determining that after the defendant's arrest five-to-six feet outside his apartment's partially opened front door, a protective sweep was authorized based on reasonable and articulable suspicion that another person inside might pose a danger); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996) ("[T]he fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers have a reasonable articulable suspicion that a protective sweep is necessary by reason of a safety threat."  (citation omitted)); United States v. Cavely, 318 F.3d 987, 995 (10th Cir. 2003) (stating that "exigencies" accompanying an arrest just outside of a residence may warrant "a protective sweep" when the officers have reasonable and articulable suspicion that the home is harboring an individual posing a danger to them (citation omitted)).

State courts also apply the second Buie prong to protective sweeps inside the home following an arrest outside the residence.  See, e.g., Brumley v. Commonwealth, 413 S.W.3d 280, 285-88 (Ky. 2013) (finding that arrest outside of a trailer did not justify a protective sweep inside because the

33

Commonwealth did not satisfy the second prong of <u>Buie</u>); <u>State v. Revenaugh</u>, 992 P.2d 769, 773 (Idaho 1999) (holding "that the 'protective sweep' exception to the warrant requirement applies when the suspect is arrested/detained outside the residence, provided that the officers have the requisite reasonable, articulable suspicion necessary to support the sweep").

D.

We have no doubt that, in certain circumstances, police officers may face as serious a threat to their safety by making an arrest "just outside a home" as they would by making an in-home arrest. <u>See</u> <u>Colbert</u>, 76 F.3d at 776. In balancing the fundamental privacy rights afforded to the home under the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution and the unquestionable need to ensure officer safety when an arrest is made in the area immediately outside a home, the justification for entry into the home to conduct a protective sweep must be based on the second prong in <u>Buie</u> -- whether the officers have a reasonable and articulable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene," 494 U.S. at 334. <u>Accord</u> <u>White</u>, 748 F.3d at 510-13.

Whether police officers making an arrest just outside a home have a reasonable and articulable suspicion of a safety threat necessitating a protective sweep of parts or all of the residence will depend on the facts known

34

to the officers at the time.  See Colbert, 76 F.3d at 776-77.  An "unparticularized suspicion" or a "hunch" that an attack may be launched from a residence will not be sufficient to justify breaching the threshold of a home and undertaking a protective search.  See Buie, 494 U.S. at 332 (quoting Terry, 392 U.S. at 27).  Courts must "look at the totality of the circumstances to determine if there is an 'individualized, rather than generalized, suspicion,'" Bryant, 227 N.J. at 70 (quoting Davila, 203 N.J. at 129), understanding that "[t]here is no mathematical formula to determine what amount of suspicion is reasonable," ibid. (citing State v. Pineiro, 181 N.J. 13, 27 (2004)).

The federal circuit courts of appeals in assessing whether a protective sweep was justified under prong two of Buie -- when an arrest has been made just outside a home -- have focused on the quantity and quality of the articulable facts that prompted the sweep.  See Sharrar, 128 F.3d at 824.

In Lawlor, the First Circuit upheld a protective sweep of a home.  In that case, two Maine State Troopers arrived at a home after a concerned citizen reported hearing a gunshot and seeing a brawl involving two men outside a residence.  406 F.3d at 38-39.  When the first trooper arrived at the scene he observed the defendant, who was armed with a two-by-four, and another man yelling at each other in front of the house, and an unknown woman standing in the doorway.  Id. at 39.  The trooper handcuffed the two men and observed two

35

spent shotgun shells in front of the doorway but no gun. Ibid. The trooper had reason to believe that the defendant lived in the house with his brother and that the occupants were involved in drug-related activities. Ibid. In addition, over the years, the trooper observed people entering and leaving the house. Ibid. When the trooper asked the defendant for the location of the gun, the defendant shrugged his shoulders. Ibid. The First Circuit concluded that "[a] reasonably prudent officer in [the trooper's] position would have been warranted in fearing that the residence harbored an individual posing a danger to those at the scene" and therefore justified in conducting a protective sweep. Id. at 42 (footnote omitted).

In Colbert, the Sixth Circuit determined that the protective search did not conform with the constitutional dictates outlined in Buie. 76 F.3d at 775. In that case, law enforcement officers staked out the defendant's apartment for the purpose of arresting him on a warrant charging him with escape related to his prior convictions for weapons and assault offenses. Ibid. The apartment was leased by the defendant's girlfriend. Ibid. When the defendant left his apartment and walked to his car forty to fifty feet away, he was arrested and handcuffed. Ibid. A few moments later, the defendant's girlfriend, apparently having observed the defendant's arrest, ran out of the apartment in an agitated state, yelled at the officers, and was detained. Ibid. A federal agent testified

36

that he was concerned that someone was still inside the apartment and therefore opened a closed screen door and conducted a protective sweep. Ibid.

The Sixth Circuit invalidated the search because the agent did not have information that anyone else was inside the apartment before the sweep. Id. at 777-78. Additionally, the court emphasized that the "dangerousness" of the defendant, who was handcuffed and in custody, by itself, did not give rise to "a reasonable suspicion of a threat from some other person inside the home" to justify a protective sweep. Id. at 777. See also State v. Spencer, 848 A.2d 1183, 1187, 1194-96 (Conn. 2004) (finding that, following the defendant's arrest in a common hallway, the officers lacked "specific and articulable facts" to conduct a protective sweep of his apartment given the absence of any information that a person inside the apartment posed a threat (citation omitted)); Murphy v. State, 995 A.2d 783, 791 (Md. Ct. Spec. App. 2010) (finding that, following the suspects' arrest outside the defendant's apartment, based on inferences drawn from the robbery victim's account, a protective sweep was justified because the police had reason to believe that two of the robbers remained inside, with one possibly armed with a gun).

### E.

Ultimately, whether a "reasonably prudent officer," who has arrested a suspect outside a home, has sufficient "articulable facts" to form an

objectively reasonable belief "that the area to be swept harbors an individual posing a danger to those on the arrest scene" will depend on the totality of the evidence. See Buie, 494 U.S. at 334. Entry into a home without a warrant, under our jurisprudence, is presumptively unreasonable and therefore not the norm. Edmonds, 211 N.J. at 129. A protective sweep is an exception to the warrant requirement and a species of exigent circumstances. Cavely, 318 F.3d at 995 (stating that "the same exigent circumstances present in Buie" may also be present following an arrest outside of a residence). The State bears the burden of proving the necessity of entering the home to conduct a protective sweep. Cope, 224 N.J. at 546.

Some factors that may be considered in determining whether a protective sweep is justified when an arrest is made outside the home are (1) whether the police have information that others are in the home with access to weapons and a potential reason to use them or otherwise pose a dangerous threat; (2) the imminence of any potential threat; (3) the proximity of the arrest to the home; (4) whether the suspect was secured or resisted arrest and prolonged the police presence at the scene; and (5) any other relevant circumstances. Entry into the home and a protective sweep cannot be based on a self-created exigency by the police. See Davila, 203 N.J. at 103.

IV.

We now apply those principles to determine whether the protective sweeps in the <u>Radel</u> and <u>Terres</u> cases comport with the Fourth Amendment and Article I, Paragraph 7 of our State Constitution.

A.

<u>Radel</u>

On October 27, 2015, the Passaic County Prosecutor's Office had an order issued by a Superior Court judge, authorizing Little Falls police officers to retrieve from Radel's home -- listed as 103 Browertown Road -- any firearms, including a Beretta, and to do so "immediately upon receipt of a copy of [the] Order." Inexplicably, that order was not faxed to the Little Falls Police Department for more than two months. After Little Falls Sergeant Prall received the order, he waited another twelve days to enforce the order. Within that time, he learned that Radel had two active municipal arrest warrants, that Radel resided at 81 Browertown Road, and that he possessed firearms in addition to the Beretta. Based on Radel's prior criminal conviction, it was unlawful for him to possess a firearm.

The State acknowledges that Sergeant Prall had probable cause to secure a warrant to search for weapons in Radel's residence. Prall did not apply for a search warrant, but rather put in motion an operation of seven officers to

39

surveil Radel's home at 81 Browertown Road and his parents' home at 103 Browertown Road for the purpose of arresting him and enforcing the order. Within approximately ten minutes of the start of the surveillance, Radel was arrested in his driveway while placing a laundry basket in his car. He was handcuffed and did not resist. Sergeant Prall testified that because Radel appeared under the influence, he did not attempt to ask for his consent to search his home. Sergeant Prall, however, questioned Radel about the presence of firearms in his home. Radel denied having any, according to Prall.

No crisis arose at the scene; the operation went according to plan. The police could have escorted Radel off the property, placed him in a patrol car, and transported him to headquarters; secured the perimeter of the property; and secured a search warrant. Instead, Sergeant Prall directed three officers to conduct a protective sweep of the house, despite the absence of any discernible exigency.

The police had no information that another person was either in the house or posed a danger. Sergeant B. Prall saw someone wearing a blue jacket enter the rear door of the house; but Radel, wearing a blue jacket, walked out the front door ten minutes later. The blue-jacketed person was apparently the same person -- Radel. That the windows to the house were covered from the

inside generally does not suggest nefarious activity; after all, the purpose of drapes or shades is to provide privacy or screen out the sun.

Sergeant B. Prall heard a loud metallic sound in the backyard but did not suggest that the sound indicated a gunshot. Presumably, an experienced police officer, like Sergeant B. Prall, can recognize the sound of gunfire. The trial court's conclusion that the metallic sound was a gunshot has no support in the record.

The police did not know who owned the second car in the driveway. Sergeant Prall did not know whether the second vehicle was used by Radel, whether it belonged to his parents or a friend, or whether it was owned by some unknown person in the house. That second car, standing alone, did not give rise to a reasonable suspicion that another person was present in the house and dangerous. See Bryant, 227 N.J. at 74; Colbert, 76 F.3d at 778.

The State's supposition that some unknown person in Radel's house could have launched a surprise attack from the front or back door or fired a weapon from the window constituted no more than an "inchoate and unparticularized suspicion or 'hunch'" -- not "specific and articulable facts," as required by Buie. See 494 U.S. at 332 (quoting Terry, 392 U.S. at 21, 27); see also Colbert, 76 F.3d at 778 ("'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place."). We

41

agree with the Appellate Division that the trial court's factual findings are not supported by sufficient credible evidence in the record.  See Elders, 192 N.J. at 243.  Like the Appellate Division, we conclude that the police did not have reasonable and articulable suspicion to believe that "the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene."  See Buie, 494 U.S. at 334.

The facts in Terres stand in stark contrast to those in Radel.

## B.

## Terres

On September 14, Detective Petrosky and Sergeant Koller of the Gloucester County Prosecutor's Office and State Police Troopers Hershey and Smith went to the Ca Nook Trailer Park, armed with an arrest warrant, to take Fuller into custody for failing to appear on a theft charge and for violating the terms of his pre-trial release.  A court had issued the arrest warrant three days earlier, and the officers had learned that Fuller no longer lived at his last known address and might be staying with Terres, who days earlier was arrested by the State Police for possession of a large quantity of narcotics.  Terres told Trooper Hershey that Fuller could be found at the first building to the right at the trailer park's entrance -- a trailer park generally known to have a high incidence of criminal activity.

When Detective Petrosky and Trooper Hershey announced their presence at the building's open front door, Boston and Willis were inside.  Upon seeing the officers, Boston fled.  Detective Petrosky, believing that Boston might in fact be Fuller, apprehended him in a bedroom littered with loose bullets and shell casings.  A criminal background check revealed outstanding warrants for the arrest of Willis and Boston.

Willis indicated that he had seen Fuller minutes earlier in the company of another male in a back trailer.  The officers knew that the trailer belonged to Terres.  Willis warned the officers "to be careful."  Sergeant Koller and Trooper Smith took custody of Boston and Willis, and Detective Petrosky and Trooper Hershey proceeded to Terres's trailer where they split up.

Looking through the trailer window, Detective Petrosky saw Fuller talking to a woman.  Despite Petrosky's order that Fuller get to the ground and that he was under arrest, Fuller fled.  Trooper Hershey caught Fuller as he exited the front door, placed him face down on the deck, and handcuffed him.  Within five feet of the front door, Trooper Hershey was struggling to secure a hypodermic needle from Fuller's pocket when Detective Petrosky appeared.  The woman Petrosky had earlier seen in the trailer was standing in the open front door holding a baby.  Petrosky stepped over Trooper Hershey, who was

still struggling with Fuller on the deck.  Petrosky asked the woman where the other male was, but she denied that anyone else was inside.

In this dynamic and uncertain situation, Detective Petrosky reasonably believed a potentially dangerous individual was located inside Terres's trailer. Detective Petrosky had been told that Fuller had been staying in a building where Petrosky observed loose bullets and shell casings.  One of the building's occupants had told Detective Petrosky that a male was with Fuller in Terres's trailer and added that Petrosky should "be careful."  Additionally, Petrosky knew that, just days earlier, Terres had been arrested on a narcotics charge. The officers faced a heightened danger when Fuller disobeyed a police order, fled from the trailer, and was ultimately intercepted by Trooper Hershey on the trailer's porch.  Last, when Detective Petrosky entered the trailer, Trooper Hershey was lying in a prone position, struggling with Fuller, within feet of the trailer's open front door.

Under all of those circumstances, Detective Petrosky had a reasonable and articulable suspicion to believe that a person might be in the trailer capable of launching an attack -- and the imminence of the potential threat did not allow for calm reflection but required prompt action.  See Buie, 494 U.S. at 334; Davila, 203 N.J. at 126.  Detective Petrosky was warranted in conducting a protective sweep, and the sweep he conducted was limited in duration and

scope. During the sweep, Petrosky observed a handgun and barrels of rifles or shotguns in a hole large enough to hold a person. With that information, Trooper Hershey obtained a warrant to search the trailer. Like the Appellate Division, we hold that the trial court's factual findings justifying the protective sweep were based on sufficient credible evidence in the record. See Elders, 192 N.J. at 243.

C.

In summary, Radel and Terres illustrate invalid and valid uses of the protective-sweep doctrine.

In Radel, the police executed a controlled arrest in the driveway -- a distance from the home's entrance -- with watchful eyes on the front and rear doors of the house. The officers did not face a discernible threat. The officers had no specific information that another person was in the house, nor was there information from which they could reasonably infer that someone inside posed an imminent danger. Nothing unforeseeable occurred at the scene; no danger arose that mandated an entry of the home without a search warrant. Therefore, a protective search was not justified under Buie.

On the other hand, in Terres, Detective Petrosky and Trooper Hershey faced unexpected and fast-evolving circumstances that signaled danger and the need for prompt action to safeguard their lives. The officers received a

45

warning to be careful and that another male was with Fuller in Terres's trailer -- a clear signal of a potential threat; they had been told that Fuller was staying in a building where loose bullets and shell casings were observed; Fuller fled the trailer when he was arrested within feet of the open front door; and the situation was fluid and not stabilized as Trooper Hershey attempted to retrieve a hypodermic needle from Fuller's pocket. Those specific and articulable facts in Terres provided a reasonable basis for entry into the home based on a very real and potential danger.

We emphasize that the home is a protected sanctuary under our Federal and State Constitutions and that a warrantless protective sweep, when an arrest occurs outside the home, will be the rare circumstance. Nevertheless, our jurisprudence does not require police officers to forgo taking reasonable measures to protect against life-threatening dangers.

V.

For the reasons expressed, we affirm the judgments of the Appellate Division in both Radel (invalidating the protective sweep) and Terres (upholding the protective sweep). In Radel, we remand to the trial court to determine whether, excluding the information gathered during the

46

unconstitutional sweep, sufficient facts were presented in the warrant affidavit to justify the issuance of the search warrant.[12]


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.

---

[12] Depending on the outcome of that determination, the issues raised earlier by Radel on direct appeal but not addressed by the Appellate Division are preserved for future appellate review.